ROBERTA FORD *v.* BLUE CROSS AND BLUE
SHIELD OF CONNECTICUT, INC.
(13667)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued April 5—decision released July 31, 1990

*Charles L. Howard,* with whom were *Linda L. Yoder* and, on the brief, *Paul W. Orth,* for the appellant-appellee (defendant).

*Jonathan L. Gould,* with whom were *Susan Price-Livingston* and, on the brief, *Anne Goldstein,* for the appellee-appellant (plaintiff).

HULL, J. The dispositive issue in this appeal is whether the trial court properly instructed the jury concerning the allocation of burdens of proof in an action brought by an employee pursuant to General Statutes § 31-290a,[1] alleging wrongful termination of employ-

---

[1] General Statutes § 31-290a provides: "(a) No employer who is subject to the provisions of this chapter shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter.

"(b) Any employee who is so discharged or discriminated against may either: (1) Bring a civil action in the superior court for the judicial district where the employer has its principal office for the reinstatement of his previous job, payment of back wages and reestablishment of employee benefits to which he would have otherwise been entitled if he had not been discriminated against or discharged and any other damages caused by such discrimination or discharge. The court may also award punitive damages. Any employee who prevails in such a civil action shall be awarded reasonable attorney's fees and costs to be taxed by the court; or (2) file a complaint with the chairman of the workers' compensation commission alleging vio-

ment. The plaintiff, Roberta Ford, instituted this action pursuant to § 31-290a, claiming that the defendant, Blue Cross and Blue Shield of Connecticut, Inc., had terminated her employment because she had filed a claim for workers' compensation benefits. The case was tried before a jury that found in favor of the plaintiff and awarded damages as follows: $95,270 for payment of back wages; $3703 for loss of employee benefits; $50,000 for other damages; $49,657.66 for attorney's fees; and $962.50 for other costs. The trial court rendered judgment in accordance with the verdict and additionally ordered that the plaintiff be reinstated to her previous employment position. From this judgment the defendant appealed and the plaintiff cross appealed to the Appellate Court; we subsequently transferred this case to ourselves pursuant to Practice Book § 4023. We reverse the judgment of the trial court and remand the case for a new trial.

Evidence was presented at trial from which the jury could reasonably have found the following facts. In 1971, the defendant hired the plaintiff, a 1946 nursing school graduate, as a manager in its medical review department. The plaintiff subsequently held several other positions in this department, and in January, 1983, became a senior medical records examiner. In

lation of the provisions of subsection (a) of this section. Upon receipt of any such complaint, the chairman shall select a commissioner to hear the complaint, provided any commissioner who has previously rendered any decision concerning the claim shall be excluded. The hearing shall be held in the workers' compensation district where the employer has its principal office. After the hearing, the commissioner shall send each party a written copy of his decision. The commissioner may award the employee the reinstatement of his previous job, payment of back wages and reestablishment of employee benefits to which he otherwise would have been eligible if he had not been discriminated against or discharged. Any employee who prevails in such a complaint shall be awarded reasonable attorney's fees. Any party aggrieved by the decision of the commissioner may appeal the decision to the appellate court."

these capacities, the plaintiff received satisfactory performance appraisals. Following an appraisal in December, 1984, the plaintiff was recommended by her supervisor, Toni Jackson Starrs, for a promotion to the higher salaried position of utilization review specialist. This new position entailed more complex duties than did the position of records examiner. In particular, the utilization review specialist was responsible for on-site audits of home health agencies and the compilation of periodic statistical reports for the Health Care Financing Administration, the federal agency that oversees the medicare program. Although the plaintiff had been suffering for several months from anxiety due to the pressure of her job as senior medical records examiner, she decided to accept the promotion.

Upon taking the position of utilization review specialist, the plaintiff was required to perform certain of the functions of her former position as well as the duties of the new position. The plaintiff received negligible formal training regarding her new responsibilities and soon began having difficulty performing all of the functions of her job. Because of this difficulty, the plaintiff sought guidance and assistance from Starrs, but received little instruction.

On January 30, 1985, the plaintiff was having difficulty completing an audit that was due the following day. She was eventually reduced to tears and left work. The following day she consulted Gerald Flamm, a psychiatrist, who diagnosed her as suffering from depression and anxiety. Flamm sent a letter to the defendant in which he stated that due to the plaintiff's condition, she was unable to work. Flamm did not clear the plaintiff to return to work until February 25, 1985. On February 26, 1985, after returning to work, the plaintiff filed a notice of claim for workers' compensation benefits, claiming that her disability had been caused by work-related stress.

During the plaintiff's absence from work, Starrs reassigned the plaintiff's work to other members of the department who discovered numerous errors in the reports on which the plaintiff had been working. When the plaintiff returned to work, however, little was said about either her absence or the problems with her work. Upon her return to work, the plaintiff assumed a reduced workload that resulted in a reduction of her anxiety and depression. Nevertheless, errors in her work continued to occur.

On May 8, 1985, Starrs informed the plaintiff that she had received a call from the defendant's insurance carrier inquiring about the plaintiff's stress-related medical problems. The plaintiff explained that the call concerned her workers' compensation claim. Starrs thereafter called Norma Ginter, an employee then in charge of administering the defendant's disciplinary procedures, to discuss the plaintiff's situation. Ginter's notes and testimony regarding that conversation indicated that Starrs initiated discussion about the plaintiff's workers' compensation claim and Starrs' concern about the insurance carrier's investigation of her department. Starrs also discussed with Ginter the problems with the plaintiff's job performance. On May 9, 1985, Starrs and Ginter again discussed the plaintiff, a conversation that resulted in their agreement to offer the plaintiff an early retirement option. Starrs and Ginter agreed that, if the plaintiff refused this option, they would then initiate formal disciplinary procedures.

Starrs met with the plaintiff on May 10, 1985, a meeting that commenced with Starrs' mention of the fact that the plaintiff had filed a workers' compensation claim. Starrs then informed the plaintiff that she had detected problems with the plaintiff's job performance, particularly her inability to perform the audits and compile the statistical records. The discussion thereafter turned to options available to the plaintiff such as early

retirement, part-time work, and transfer to another department. The meeting then ended as it had begun with Starrs' mention of the plaintiff's pending workers' compensation claim.

Starrs' treatment of the plaintiff at this meeting resulted in the recurrence of the plaintiff's symptoms of anxiety. The plaintiff, nonetheless, decided against early retirement. When the plaintiff informed Starrs of her decision, Starrs instituted the first step in the defendant's formal discipline process by placing the plaintiff on a forty-five day warning, commencing June 13, 1985. Starrs told the plaintiff that if her work did not improve during that time further discipline would result. The plaintiff requested that Starrs show her the errors that she had made in her work, a request that Starrs refused.

The plaintiff thereafter returned to Flamm for further treatment for her stress. Flamm found that the plaintiff's renewed stress took the form more of anxiety than of depression for which he prescribed medication and recommended further consultative therapy. He felt that the increased anxiety from which the plaintiff suffered during the period May to August, 1985, was caused by the defendant's disciplinary action.

During mid-June, 1985, the plaintiff consulted with an attorney concerning the events that had transpired at work. On June 20, 1985, the attorney sent a letter to the defendant's director of human resources, Nicholas Reuter, claiming that the defendant's recent discipline of the plaintiff was in retaliation for the plaintiff's workers' compensation claim. Reuter referred the letter to Joan Hartley, the manager of communications and equal employment within the department. Hartley thereafter became involved in the plaintiff's disciplinary process in an effort to ensure that the discipline

imposed was based upon errors made during the relevant warning period.

On July 28, 1985, the plaintiff wrote a rebuttal to Starrs' June 13 warning that ultimately had been reduced to writing in early July. Upon Starrs' receipt of the rebuttal, she slammed her office door in the plaintiff's presence, commenting that the plaintiff had now made things impossible. Starrs met again with the plaintiff on July 31, 1985, to discuss the plaintiff's work product. Starrs identified errors in the plaintiff's work, some of which had been made by the plaintiff prior to the first verbal warning issued in June. At this meeting, Starrs issued the plaintiff a second warning. Upon issuing this warning, Starrs indicated that if the plaintiff did not improve her performance within thirty days, her employment would be terminated.

Other members of the department in which the plaintiff was working during the summer of 1985 were also suffering from job-related stress that resulted in mistakes in their work product. The plaintiff, however, was the only member of the department that had filed a workers' compensation claim; the plaintiff was also the only member against whom Starrs had initiated formal disciplinary procedures.

The plaintiff's workload was reduced during the month of August. An employee to whom Starrs had delegated the job of checking the plaintiff's work indicated that the plaintiff's performance was improving. During this time, the plaintiff continued to receive treatment from Flamm for her anxiety. On the basis of his contact with the plaintiff, Flamm determined that it was not healthy for the plaintiff to remain in Starrs' department. As a result, on August 26, 1985, Flamm requested in a letter to the defendant that the plaintiff be transferred to a different department.

Flamm's letter was reviewed by Hartley, Starrs and Starrs' direct supervisor, James Buccheri. Starrs indicated to the others that the plaintiff's performance had not improved, although she admitted that she was not sure that the work she had reviewed in August had actually been completed during that month. Starrs then recommended that the plaintiff's employment be terminated immediately. Hartley, however, did not take Starrs' recommendation. In consideration of the plaintiff's seniority and the letter from Flamm, Hartley decided to give the plaintiff until January 17, 1986, to find other permanent employment with the defendant through its placement pool. The employee placement pool assists employees whose jobs have been eliminated or who are unable to perform their jobs due to health reasons to find other positions within the defendant company.

In early September, 1985, Buccheri temporarily placed the plaintiff in another department. Buccheri failed to inform the supervisor of that department, however, that the plaintiff was in the employment pool and was looking for work within the company. Rather, Buccheri merely stated that the plaintiff would be in the department temporarily because she would be leaving the company within four months.

On September 13, 1985, the plaintiff wrote to Hartley indicating her desire to be notified of and considered for every job opening within the defendant company. Although she stated that she wished to review all of these openings with Hartley, Hartley did not meet with the plaintiff until the day of her termination. Likewise, Hartley's subordinates assigned to the plaintiff's case never met with the plaintiff to review her employment goals, conduct in violation of the defendant's written employee pool placement policies.

The plaintiff interviewed for three positions within the defendant that paid salaries comparable to the salary she had received for the utilization review specialist position, but was not offered any of the positions. On January 16, 1986, the plaintiff wrote to Buccheri asking that she be allowed to stay on in any position within the company rather than being terminated on January 17, 1986. The plaintiff further expressed her desire to be considered for any position that might become available after January 17. Although Buccheri received the plaintiff's correspondence prior to the close of business on January 17, 1986, he took no action to retain the plaintiff. This inaction occurred despite the fact that the department in which the plaintiff was working had sufficient work for the plaintiff to do and the fact that other jobs were to become available within the defendant company soon after January 17. Buccheri and Starrs had signed the plaintiff's termination papers on January 15, 1986. The plaintiff's employment was accordingly terminated on January 17, 1986.

On appeal, the defendant claims that the trial court improperly: (1) submitted the plaintiff's § 31-290a claim to a jury; (2) instructed the jury regarding the allocation of burdens of proof; (3) refused to set aside the verdict and to render judgment for the defendant notwithstanding the verdict; (4) admitted into evidence testimony concerning the plaintiff's fee arrangement with her attorney; (5) denied the defendant's motion to strike the plaintiff's claim for humiliation, anxiety and emotional distress; (6) admitted into evidence irrelevant and unfairly prejudicial evidence; (7) misled the jury regarding the calculation of damages and attorney's fees; (8) refused to set aside the verdict as excessive or to order a remittitur; and (9) ordered that the plaintiff be reinstated. The plaintiff claims on her cross appeal that the court improperly failed to award her attorney's fees as required by § 31-290a.

We conclude that the trial court improperly instructed the jury concerning the allocation of burdens of proof in an action brought pursuant to § 31-290a, and accordingly, reverse the judgment of the trial court and remand the case for a new trial. We, therefore, do not reach the last four issues raised in this appeal and address the defendant's other claims only to the extent necessary for the retrial. Given our disposition of the defendant's appeal, we dismiss the plaintiff's cross appeal.

## I

We turn first to the defendant's claim that the trial court improperly permitted the plaintiff's action to be tried to a jury. The gravamen of this claim is that because the plaintiff's cause of action was purely statutory, she did not have a right to a jury trial. We do not agree.

The standards used to determine whether a party is entitled to a trial by jury are well established. "Under article first, § 19, of the Connecticut constitution, as amended, '[t]he right of trial by jury shall remain inviolate.' We have consistently held that the scope of article first, § 19, is defined by applying a historical test. The right to a jury trial may not be abrogated for causes of action that were triable to the jury prior to the constitution of 1818, and extant at the time of its adoption. *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill,* 203 Conn. 63, 76, 523 A.2d 486 (1987); *Seals* v. *Hickey,* [186 Conn. 337, 349–50, 441 A.2d 604 (1982)]; *Gentile* v. *Altermatt,* 169 Conn. 267, 298, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); *Swanson* v. *Boschen,* 143 Conn. 159, 165, 120 A.2d 546 (1956). Consequently, statutory actions established since the adoption of the constitution of 1818 ordinarily fall outside the scope of the provision, 'unless, perhaps, the new

remedy constitutes "a modification of existing remedies, so vital as to unduly limit and violate the right of trial by jury." ' *United States Fidelity & Guaranty Co.* v. *Spring Brook Dairy, Inc.,* 135 Conn. 294, 297, 64 A.2d 39 (1949), quoting *Meigs* v. *Theis,* 102 Conn. 579, 592, 129 A. 551 (1925)." *Bishop* v. *Kelly,* 206 Conn. 608, 618, 539 A.2d 108 (1988).

We have held, therefore, that the right to a jury trial exists both in cases in which it existed at common law at the time of the adoption of the constitutional provisions preserving it *and* in cases substantially similar thereto. *Skinner* v. *Angliker,* 211 Conn. 370, 374, 559 A.2d 701 (1989); *Swanson* v. *Boschen,* supra; see also 47 Am. Jur. 2d, Jury § 17. "At common law, 'legal claims [were] tried by a jury, [and] equitable claims [were] tried by a court . . . . ' *Miles* v. *Strong,* 68 Conn. 273, 286, 36 A. 55 (1896); *Dawson* v. *Orange,* 78 Conn. 96, 100, 61 A. 101 (1905). Equitable actions, therefore, are not within the constitutional guarantee of trial by jury. *Franchi* v. *Farmholme, Inc.,* 191 Conn. 201, 210, 464 A.2d 35 (1983); *United States Fidelity & Guaranty Co.* v. *Spring Brook Dairy, Inc.,* supra." *Skinner* v. *Angliker,* supra.

"General Statutes § 52-215, provides that as a matter of right 'civil actions involving such an issue of fact as, prior to January 1, 1880, would not present a question properly cognizable in equity' should be entered on the docket as jury cases upon proper request. Section 52-215 goes on to state that certain enumerated actions and 'all other special statutory proceedings, which, prior to January 1, 1880, were not triable by jury,' shall be tried to the court without a jury. . . . [T]he term ' "special statutory proceedings" cannot be construed, under the constitutional provisions guaranteeing jury trials, [however,] to mean any cause of action whatsoever, simply because it is authorized by an enactment of the legislature. If it could, the legisla-

ture, by the process of giving legislative sanction to common-law causes of action, could, in the course of time, obviate the guarantee of jury trial completely. . . . The test is whether the issue raised in the action is substantially of the same nature or is such an issue as prior to 1818 would have been triable to a jury.' [*Swanson* v. *Boschen, supra*, 164–65; s]ee also *United States Fidelity & Guaranty Co.* v. *Spring Brook Dairy, Inc., supra*, 297." *Skinner* v. *Angliker, supra*, 374–75.

"Accordingly, in determining whether a party has a right to a trial by jury under the state constitution and § 52-215, the court must ascertain whether the action being tried is similar in nature to an action that could have been tried to a jury in 1818 when the state constitution was adopted. This test requires an inquiry as to whether the course of action has roots in the common law, and if so, whether the remedy involved was one in law or equity. If the action existed at common law and involved a legal remedy, the right to a jury trial exists and the legislature may not curtail that right either directly or indirectly. *Franchi* v. *Farmholme, Inc., supra; Swanson* v. *Boschen, supra; United States Fidelity & Guaranty Co.* v. *Spring Brook Dairy, Inc., supra; Windham Community Memorial Hospital* v. *Windham,* 32 Conn. Sup. 271, 273, 350 A.2d 785 (1975)." *Skinner* v. *Angliker, supra*, 375–76.

We note that it is undisputed that a § 31-290a action involves a legal remedy, and, therefore, we address only the question of whether this action has roots in the common law. We turn for guidance on this question to our decision in *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), involving a claim for retaliatory discharge brought pursuant to the Uniform Food, Drug and Cosmetic Act. In *Sheets* we stated: "In the light of . . . recent cases, which evidence a growing judicial receptivity to the recognition of a tort claim

for wrongful discharge, the trial court was in error in granting the defendant's motion to strike. The plaintiff alleged that he had been dismissed in retaliation for his insistence that the defendant comply with the requirements of a state statute, the Food, Drug and Cosmetic Act. We need not decide whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy. Certainly when there is a relevant state statute we should not ignore the statement of public policy that it represents." Id., 480; see also *Magnan* v. *Anaconda Industries, Inc.,* 193 Conn. 558, 565, 479 A.2d 781 (1984).

These comments are applicable to the question presently before us because, as one trial court has so aptly noted, "[§] 31-290a is essentially a codification of the *Sheets* holding, in the context of workers' compensation." *Robidoux* v. *United Parcel Service, Inc.,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 296444 (September 12, 1985). A violation of § 31-290a, a statute obviously designed to protect claimants who file for benefits under one of this century's most socially ameliorative statutory programs, is in essence a statutorily created tort deriving from the action for wrongful discharge set forth in *Sheets.* It should be recalled that our modern law of torts has its origins in the common law actions of trespass and trespass on the case.[2] W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 6, pp. 28–31. We conclude, therefore, that because the classical the-

---

[2] At common law, "[t]respass was the remedy for all forcible, direct and immediate injuries, whether to person or to property—or in other words, for the kind of conduct likely to lead to a breach of the peace by provoking immediate retaliation. Trespass on the case . . . [was] designed to afford a remedy for obviously wrongful conduct resulting in injuries which were not forcible or not direct." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 6, p. 29.

ory upon which recovery is based in actions brought pursuant to § 31-290a was redressable at common law, the plaintiff's action was properly tried to a jury.

## II

We turn next to the defendant's challenge to the trial court's charge to the jury regarding the allocation of burdens of proof in a § 31-290a action. The defendant claims that the effect of the court's instruction was to place improperly on the defendant the burden of disproving the plaintiff's claim. We agree.

In setting forth the burden of proof requirements in a § 31-290a action, we look to federal law for guidance. See *Wroblewski* v. *Lexington Gardens, Inc.,* 188 Conn. 44, 53, 448 A.2d 801 (1982) (court guided by federal law in sex discrimination action); *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities,* 170 Conn. 327, 331, 365 A.2d 1210 (1976) (in sex discrimination action court guided by the case law surrounding federal fair employment legislation, 42 U.S.C. § 2000e et seq.); see also *Twilley* v. *Daubert Coated Products, Inc.,* 536 So. 2d 1364, 1369 (Ala. 1988) (applied federal standards of proof to claims of retaliation in the workers' compensation context).

In *McDonnell Douglas Corporation* v. *Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the United States Supreme Court set forth the basic allocation of burdens and order of presentation of proof in cases involving claims of employment discrimination. The plaintiff bears the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. Id., 802. In order to meet this burden, the plaintiff must present evidence that gives rise to an inference of unlawful discrimination. *Texas Department of Community Affairs* v. *Burdine,* 450 U.S. 248, 252–53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). If the plaintiff meets this initial burden, the burden then

shifts to the defendant to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corporation* v. *Green,* supra. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Texas Department of Community Affairs* v. *Burdine,* supra, 255. The plaintiff then must satisfy her burden of persuading the factfinder that she was the victim of discrimination "either directly by persuading the court [or jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id., 256; see *McDonnell Douglas Corporation* v. *Green,* supra, 804–805.

The defendant claims that the trial court's charge to the jury regarding the burden of proof requirements in the case was incomplete in that the court did not clearly instruct the jury on the third step outlined above. The court instructed the jury as follows: "Now, it's the plaintiff's initial burden to produce some evidence from which you can reasonably infer that the defendant's action occurred in substantial part because she had exercised her rights under the statute. . . . Now, if you determine that the plaintiff has produced enough evidence to create an inference of an improper motive on the part of [the defendant], the burden then shifts to [the defendant] to produce evidence that it terminated the plaintiff for some legitimate, nondiscriminatory reason." The court thereafter did not delineate the third step requiring that the plaintiff then "demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Department of Community Affairs* v. *Burdine,* supra, 256.

The ultimate test to be applied to jury instructions " ' " 'is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law.' " ' " *Ellice* v. *INA Life Ins. Co. of New York,* 208 Conn. 218, 226, 544 A.2d 623 (1988), quoting *State* v. *Davis,* 198 Conn. 680, 686, 504 A.2d 1372 (1986). "The adequacy of the instructions must be determined in the light of their overall impact on the jury. *State* v. *Truppi,* 182 Conn. 449, 458, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981) . . . . The charge must be examined to determine whether it fairly presents a case to a jury and is not to be subject to a degree of scrutiny that is tantamount to a microscopic examination seeking technical flaws, inexact, inadvertent or contradictory statements. *Ubysz* v. *DePietro,* 185 Conn. 47, 57, 440 A.2d 830 (1981) . . . . " *Carfora* v. *Globe, Inc.,* 5 Conn. App. 526, 530, 500 A.2d 958 (1985), cert. denied, 198 Conn. 804, 503 A.2d 1186 (1986).

The plaintiff claims that the challenged omission in the trial court's charge to the jury was not improper when viewed in light of the entire charge. She points to the following statements in the court's charge to buttress her claim: (1) "[I]t's not incumbent upon the defendant to disprove the essential elements of the plaintiff's cause of action. But on the contrary, the burden of proof is on the plaintiff to prove by the fair preponderance of the whole evidence the essential elements of her case"; (2) "[The plaintiff] need show by a fair preponderance of the evidence that her filing of the workers' compensation claim was a substantial, determining factor, that is, a factor which made a difference in either the defendant's decision to remove her from the position that she would have been holding and then placing her in the pool, or and ultimately being fired or not"; and (3) "You must decide whether

or not to believe that this explanation put forth by [the defendant] was the true reason that [the plaintiff] was finally removed from her position and ultimately fired, or merely was it a pretext to cover up the defendant's discriminatory motive." The plaintiff argues that in light of the jury charge as a whole, "[t]he court's *mere* failure at this point to remind the jury of the plaintiff's burden on the *subsidiary* issue of pretext . . . cannot fairly be viewed as having misled the jury into applying the wrong burden of proof to the overriding issue in the case."[3] (Emphasis added.)

We do not view the court's omission as a "mere" failure to "remind" the jury of the plaintiff's burden on the issue of pretext. The court failed specifically to state the plaintiff's burden with respect to a key issue in the case, namely the plaintiff's claim that the reasons given by her employer for her termination were pretextual. A three-step procedure concerning the allocation of burdens of proof in employment discrimination cases has carefully been delineated by the courts. Just as the omission of a step in a three-step dance routine can result in much stumbling on the dance floor, the omission of the third step in the consideration of a § 31-290a claim can result in confusion in the jury room. The instructions were not presented to the jury in a way that clearly set forth the allocation of burdens of proof in the case. The jury was, therefore, likely misled. We, accordingly, reverse the judgment of the court and remand the case for a new trial.

---

[3] The plaintiff cites *Texas Department of Community Affairs* v. *Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), to argue that the plaintiff's burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." We conclude that this merger theory, even had it been proffered to the jury by the court, is not an adequate substitute for a clear sequential description of the three-step process involved.

## III

We turn next to the defendant's claim that the plaintiff presented insufficient evidence at trial to support the jury verdict, and that the trial court, therefore, should have granted the defendant's motion to set aside the verdict or the motion for judgment notwithstanding the verdict. The defendant maintains that because the plaintiff failed to introduce sufficient evidence to establish that the defendant's stated nondiscriminatory reason for terminating her employment was a pretext for discrimination, the plaintiff necessarily did not meet her burden of proof. We do not agree.

" 'The same principles are to be applied in the review of the court's action on each motion. . . . ' *Greene* v. *DiFazio,* 148 Conn. 419, 420, 171 A.2d 411 [1961]. In reviewing the decision of the trial court, 'we consider the evidence in the light most favorable to the sustaining of the verdict. *Petrizzo* v. *Commercial Contractors Corporation,* 152 Conn. 491, 499, 208 A.2d 748 [1965]; *Kazukynas* v. *N. C. Casciano & Sons, Inc.,* 149 Conn. 1, 2, 174 A.2d 796 [1961] . . . . ' *Kelly* v. *Bliss,* 160 Conn. 128, 130, 273 A.2d 873 [1970] . . . . If the jury could reasonably have reached their conclusion the verdict must stand. *Chanosky* v. *City Building Supply Co.,* 152 Conn. 642, 643, 211 A.2d 141 [1965]. 'The concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony, is a powerful argument for sustaining the action of the trial court. *Giambartolomei* v. *Rocky DeCarlo & Sons, Inc.,* 143 Conn. 468, 474, 123 A.2d 760 [1956].' [Id.]; *Trani* v. *Anchor Hocking Glass Corporation,* 142 Conn. 541, 545, 116 A.2d 167 [1955]; *Zullo* v. *Zullo,* 138 Conn. 712, 715, 89 A.2d 216 [1952]." *Novella* v. *Hartford Accident & Indemnity Co.,* 163 Conn. 552, 555, 316 A.2d 393 (1972).

We have detailed previously the facts, taken in the light most favorable to sustaining the verdict, that the jury could reasonably have found. The defendant's argument that this evidence is insufficient as a matter of law to support the jury verdict is premised on the fact that conflicting evidence was presented at trial concerning the intent of the defendant in terminating the plaintiff's employment. Although conflicting evidence was presented at trial, we cannot conclude on that basis that the jury verdict should not stand. " 'The choice of the more credible evidence was for [the jury] to make. *Desmarais* v. *Pinto,* 147 Conn. 109, 110, 157 A.2d 596 [1960].' *Petrizzo* v. *Commercial Contractors Corporation,* [supra, 499]. 'It is the province of the jury to weigh the evidence and determine the credibility and the effect of testimony; and we must decide the question whether on the evidence presented, the jury could have fairly reached their verdict for the [plaintiff]. *Hanauer* v. *Coscia,* 157 Conn. 49, 53, 244 A.2d 611 [1968]. . . .' " *Novella* v. *Hartford Accident & Indemnity Co.,* supra, 561. We conclude that the verdict reached by the jury was reasonable in view of the evidence. The trial court, therefore, did not improperly refuse to set aside the verdict or deny the motion for judgment notwithstanding the verdict.

## IV

The defendant next claims that the trial court improperly permitted the jury to hear testimony concerning the plaintiff's fee arrangements with her attorney. This issue is further refined by the defendant's claim that § 31-290a requires that the court, not the jury, determine an appropriate award of attorney's fees.

We note at the outset that the scope of the issue here presented by the defendant is somewhat confusing. The confusion stems from the interchangeable use by the trial court and the parties of the terms "punitive dam-

ages" and "attorney's fees." The court instructed the jury as follows: "Now, the statute also authorizes you to award the plaintiff punitive damages. . . . And the statute further goes on to say and defines what they mean by punitive damages by saying that any employee who prevails in such civil action shall be awarded reasonable attorney's fees and cost[s] to be taxed by the Court. Now, so you folks, should you get this far in the case, will then have to determine whether or not reasonable attorney's fees and costs should be determined." The court then continued by discussing the evidence concerning the plaintiff's attorney's fees.

The situation is made murkier by the fact that the corrected judgment dated December 12, 1988, included an award of "[r]easonable attorney's fees" in the amount of $49,657.66. The parties agreed at oral argument that both parties and the court used the terms "punitive damages" and "attorney's fees" interchangeably. It appears that the court was attempting to charge the jury on punitive damages as measured by attorney's fees. We need not, however, try to unscramble this particular judicial omelet. In our view, the submission of either "punitive damages" or "attorney's fees" to the jury was improper under the language of § 31-290a (b), without regard to the defendant's claim of prejudice.

Section 31-290a (b), subsequent to delineating the types of remedies available to the plaintiff, provides: "The court *may* also award punitive damages. Any employee who prevails in such a civil action *shall* be awarded reasonable attorney's fees and costs to be taxed by the court . . . ."[4] (Emphasis added.) We

---

[4] We note that on its face the statute appears to authorize the award of double attorney's fees by the court, since in Connecticut punitive damages are to be measured by reasonable attorney's fees and costs. *Vandersluis* v. *Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978). We discuss this issue in Part VI, infra.

were faced in *Bishop* v. *Kelly,* supra, with the question of whether General Statutes (Rev. to 1987) § 14-295, entrusting the award of double or treble jury awards in certain tort actions to the court, violated the defendant's right to trial by jury as guaranteed by our state constitution. We applied the test articulated herein at Part I and concluded that at the time of the state constitution of 1818, a defendant in an action pursuant to the statutory predecessor of § 14-295 had a right to have all the facts underlying an award of multiple damages tried to a jury. Id., 620. We then held that the multiple damages provision of § 14-295 was unconstitutional because it violated the defendant's right to have a jury determine whether his conduct justified the award of multiple damages. Id., 620–21.

It is important to point out what is not involved in our consideration of the issue presently before us. We are not faced here with the question of whether the *Bishop* decision mandates, as a matter of state constitutional law, that the issue of punitive damages in this case should have been tried to the jury. The defendant states that "the submission of the attorney's fees issue to the jury was improper because the statute required 'the court' to determine an appropriate award of fees." The defendant did not raise the issue of whether the punitive damages question as such should have been submitted to the jury either as a statutory or constitutional matter. The plaintiff stated in a conclusory fashion only that "it is also well settled and constitutionally required that the assessment and measure of punitive damages is the province of the jury," citing as authority for this proposition *Bishop* v. *Kelly,* supra, 620–21. The plaintiff did not further brief or argue whether the antecedents of § 31-290a, if any, extant in 1818, provided for the submission of punitive damages to the jury. Punitive damages and multiplied damages are first cousins, but we are not prepared to rule, on this

record, whether *Bishop* v. *Kelly* or the historical record of any precedents to § 31-290a mandate a result in this case similar to that in *Bishop.*

We are thus faced with the narrow question of whether as a matter of statutory construction the provision in § 31-290a that "the court may also award punitive damages" means just that and no more. On this issue, *Bishop* is persuasive. In *Bishop,* "the plaintiff maintained that when § 14-295 confers authority to impose multiple damages upon 'the court,' the term 'court' signifies the whole tribunal including the jury." Id., 615–16. We did not agree with the plaintiff's proffered construction of the statute. "In legal usage, authority conferred upon a 'court' normally contemplates action by a judge and not by a jury. For example, General Statutes § 42a-2-302 (1) leaves consideration of the possible unconscionability of a sales contract to the 'court,' for the express purpose, according to the accompanying official commentary, of foreclosing action by a jury. General Statutes Annotated § 42a-2-302, comment 3. Similarly, when, in the criminal context, General Statutes § 53a-28 (b) confers the authority to sentence upon the 'court,' that statute does not envisage action by a jury. The fact that we have, in rare circumstances, construed the term 'court' in other statutes to include the jury; see, e.g., *Banks* v. *Watrous,* 134 Conn. 592, 599, 59 A.2d 723 (1948); *Miles* v. *Strong,* 68 Conn. 273, 286–87, 36 A. 55 (1896); does not persuade us that the legislature intended to depart from ordinary usage in mandating action by 'the court' in [the statute here involved]." *Bishop* v. *Kelly,* supra, 616.

We conclude, therefore, that the legislature has authorized the court, not the jury, to determine punitive damages in a § 31-290a action.

## V

We turn now to the defendant's claim that § 31-290a does not provide for the recovery of damages for emotional distress. We need not tarry long on this issue, because the clear language of the statute is dispositive.

Section 31-290a (b) provides that an employee bringing an action pursuant thereto may seek "reinstatement of his previous job, payment of back wages and reestablishment of employee benefits to which he would have otherwise been entitled if he had not been discriminated against or discharged *and any other damages caused by such discrimination or discharge.*" (Emphasis added.) The defendant maintains that the words "other damages" are unclear and require interpretation. We do not agree.

The defendant first argues that emotional distress damages as well as other types of consequential damages are not recoverable under the overall workers' compensation scheme, because the goal of workers' compensation is to ensure uninterrupted receipt by the employee of employment-related wages and benefits. To state this unremarkable proposition is to answer it. Section 31-290a has never been considered a part of the overall workers' compensation benefit package. It is self-evidently a separate and distinct remedy intended to protect and buttress the rights of workers' compensation claimants.

General Statutes § 1-1 (a) requires that "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." "If the statutory language is clear and unambiguous, there is no room for construction. *New*

*Haven* v. *United Illuminating Co.,* 168 Conn. 478, 485, 362 A.2d 785 (1975). If there is no ambiguity in the language of the statute, it does not become ambiguous merely because the parties argue for or would prefer different meanings. *Caldor, Inc.* v. *Heffernan,* 183 Conn. 566, 570, 440 A.2d 767 (1981). When language used in a statute is clear and unambiguous, its meaning is not subject to modification or construction. *Cilley* v. *Lamphere,* 206 Conn. 6, 9–10, 535 A.2d 1305 (1988)." *State Medical Society* v. *Board of Examiners in Podiatry,* 208 Conn. 709, 721, 546 A.2d 830 (1988). We conclude that according to the plain language of § 31-290a, the trial court properly submitted to the jury the plaintiff's claim for damages for emotional distress.

## VI

The plaintiff claims in her cross appeal that the court should have granted her attorney's fees in addition to the punitive damages awarded by the jury, as measured by attorney's fees. In this appeal, this claim is academic since § 31-290a (b) provides that "[a]ny employee who *prevails* in such a civil action shall be awarded reasonable attorney's fees and costs to be taxed by the court." (Emphasis added.) In view of our reversal of the judgment in this case, it can no longer be said that the plaintiff "prevailed" in this action; she, therefore, has no claim for attorney's fees based on the judgment that we have reversed. The plaintiff's cross appeal is dismissed as moot.

We consider, however, the issue raised by the cross appeal because it may arise on the retrial of this case. The defendant's brief sheds little light on this subject since it continues the earlier treatment of "punitive damages" and "attorney's fees" by mixing these terms in an inextricable semantic stew. We treat this issue directly by looking to the statute creating the double remedy of punitive damages and attorney's fees. The

structure of the statute offers compelling evidence that the legislature knew exactly what it was doing in providing such overlapping remedies. Section 31-290a provides for an alternative course of action to the employee's institution of a civil action. An employee, alleging discharge or discrimination in violation of § 31-290a, may file a complaint with the chairman of the workers' compensation commission. General Statutes § 31-290a (b) (2). The statute provides that "[a]ny employee who prevails in such a complaint shall be awarded reasonable attorney's fees." In stark contrast to this provision, the prevailing employee who chose to institute a civil action, may be awarded punitive damages *and* shall be awarded reasonable attorney's fees, both, according to the statute, to be awarded by the court as we have concluded herein. General Statutes § 31-290a (b) (1). The obvious purpose of this disparity in remedies is the greater expense and effort generally involved in a civil action as opposed to a workers' compensation commission proceeding.

The defendant has stated no reason why the legislature does not have the power to provide for such a double remedy, nor do we recognize any such reason. We stated, albeit in dictum, in *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 617, 440 A.2d 810 (1981), a case involving the Connecticut Unfair Trade Practices Act (CUTPA), that "[t]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law. The ability to recover both attorneys' fees . . . and punitive damages . . . enhances the private CUTPA remedy and serves to encourage private CUTPA litigation."

We reach a similar conclusion with regard to § 31-290a. Although an award of what may amount in effect to double attorney's fees is unusual, we conclude

that there is no legal impediment to such a dual award in an appropriate case.

On the appeal the judgment of the trial court is reversed and the case is remanded to that court for a new trial in accordance with this opinion; the cross appeal is dismissed.

In this opinion the other justices concurred.