[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In the instant case, the court must interpret § 31-290a
of the General Statutes and determine its applicability to the facts that have been found. From the testimonial and documentary evidence presented at the trial, the facts set forth below were established.
 I.
The plaintiff began work with the Sanitation Division of the North Haven Public Works Department in 1988 as a part-time employee. About one year later he became full time and received a salary increase and medical benefits for himself and his wife. His duties were to collect rubbish and garbage. On February 14, 1990, the plaintiff injured his neck and right shoulder in the course of his employment. He and his partner had picked up a metal hot water heater. When the partner dropped his end, the plaintiff experienced a jerking of the shoulder and pain.
In North Haven, heavy metal items are collected separately from other trash. A truck known as a rack truck is used. On February 14, 1990, the plaintiff was driving the rack truck. As the driver, however, he was obligated to get out of the truck whenever his partner needed assistance with the pick-ups.
The first doctor seen by the plaintiff for his injury was Dr. Christoforo who is under contract to the defendant. Later, the plaintiff filed a claim for workers' compensation and become a patient of Dr. Connair an orthopaedic surgeon. Dr. Connair's diagnosis of the plaintiff's injuries were "right shoulder rotator cuff tendinitis-subacromial bursitis and cervical strain-degenerative disc disease." In the last report of Dr. CT Page 8163 Connair to be introduced dated May 10, 1991, he gave the plaintiff a 5% partial disability rating for the spine and a 5% partial disability rating for the right upper extremity. Dr. Luchini who examined the plaintiff for the defendant concurred with Dr. Connair's spinal assessment.
A recurrent entry in Dr. Connair's reports concerned the plaintiff's ability to work. On February 19, 1991, Dr. Connair wrote that the plaintiff "must avoid repetitive or stressful lifting, pushing and pulling. He must avoid repetitive overhead use of his right upper extremity and should not lift anymore than 10 to 15 pounds infrequently. This allows him to function as a truck driver but he should not work as a trash collector."
While still a patient of Dr. Connair, the plaintiff attempted to return to work as a truck driver in Public Works or another department. On several occasions, he spoke with Vincent Palmieri who is the defendant's Director of Finance and essentially also its Director of Personnel. Palmieri told the plaintiff that he could not be reemployed until he was cleared for work as a trash collector. In court, Palmieri testified that the plaintiff had not been certified for return to work by Med-Trac a subsidiary of Village Medical, Dr. Christoforo's organization. Med-Trac is hired by the defendant to evaluate compensation claims, non-compensation illnesses and the conditions of victims of accidents. Med-Trac had tracked the plaintiff's progress since his compensation case was six weeks old.
On March 1, 1991, nine days after Dr. Connair's report, the plaintiff's status as an employee of the defendant was terminated and he was given a pink slip signed by Mr. Palmieri as Director of Finance. The reason for the termination, as stated on the pink slip, was one year with compensation disability per union contract. The contract between the defendant and Local 1303-Council 4 American Federation of State, County and Municipal Employees (AFSCME) AFL-CIO for Public Works employees during the period from July 1, 1989 to June 30, 1992 contained the following provisions:
 9.1 Any full time employee who shall suffer personal injury in the performance of his work and who shall be eligible for payments under the Workers' Compensation Act, shall be paid by the Town for a period of one (1) year, the monetary difference between said employee's straight time wages and CT Page 8164 the benefit payable to him under the Workers' Compensation Act.
Pursuant to article 9.1, the plaintiff received regular checks for forty hours of work per week from the defendant. In return the plaintiff turned his compensation checks over to the defendant.
Contracts containing a provision like 9.1 for Public Works employees had been negotiated with AFSCME for other town departments. The only difference was that for fire fighters the period, for which a base salary would be paid in lien of disability payments under the Workers' Compensation Act, is two years rather than one. Although article 9.1 of the contract negotiated with AFSCME does not mention automatic termination of employment if within one year an employee is not certified medically to resume his or her job, the defendant has always interpreted 9.1 in this manner. A list of 17 former employees, including the plaintiff, was submitted under the title "Terminations under Provisions of Article 9.1." On Three occasions, once in 1984 and twice in 1991, the defendant's interpretation of article 9.1 has been upheld by the state Labor Department, Board of Mediation and Arbitration. One of the former employees whose claim was heard by the Board of Mediation and Arbitration also complained to the Commission on Human Rights and Opportunities where the complaint was dismissed for lack of sufficient evidence. One case is still pending before CHRO and one was reported to be in court.
The defendant has a somewhat similar policy for non-job related accidents and illnesses. An injured or ill employee whose injury is not related to work will be carried for one year but will be paid only as long as the employee's accrued vacation and sick time last. Employees can donate their accrued vacation or sick time to injured or ill co-workers. No non-job related injured employee has ever been automatically terminated at the end of one year. Their injuries or sicknesses are usually more serious resulting in death or resignation before the year expires.
When the plaintiff's employment was terminated on March 1, 1992, he feared cancellation of the insurance that had been provided for himself and his wife. He was seen by Dr. Shapiro a psychiatrist who had treated him before his injury. The second and third counts of the complaint refer to emotional distress CT Page 8165 caused by the conduct of the defendant's agents.[1] After termination, the plaintiff received unemployment compensation. His search for work in Connecticut was unsuccessful. In July, 1992, the plaintiff found a job in New Hampshire paying $5.00 per hour. His second job paid $7.00 per hour. Now he is in business for himself in New Hampshire as a maintenance subcontractor for landlords. His hourly charge is $10.00.
On January 14, 1992 the plaintiff, the defendant and the defendant's compensation carrier stipulated that the plaintiff had a permanent disability of at least 5% of the cervical spine and 2.5% of the right arm. The workers' compensation claim was settled for $11,744.30. On April 7, 1992, the plaintiff received an additional sum of $992.76 when he released the defendant from any claim that he might have had for failure to provide accident and health insurance or life insurance pursuant to Gen. Stat. § 31-284b.
Some further facts have also been found. They will appear in the next section of this memorandum.
 II.
Gen. Stat. § 31-290a(a) provides that
 No employer who is subject to the provisions of this chapter shall discharge or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter.
In Ford v. Blue Cross Blue Shield of Connecticut, Inc.,216 Conn. 40, 53 (1990) our Supreme Court relying on federal precedents[2] interpreted § 31-290a to provide for three levels of proof. The employee has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. To meet this burden, the employee must present evidence that gives rise to an inference of unlawful discrimination. If the employee satisfies his initial burden, the employer must then rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for its actions. If the employer meets this burden, the presumption raised by the prima facie case is rebutted and the factual CT Page 8166 inquiry proceeds to what is described as a "new level of specificity" but could also be considered as the employee's ultimate burden. Eventually, the employee must satisfy his burden of persuading the court that he was the victim of discrimination. As Ford, supra at 54 explains, the employee can satisfy his final burden either directly by establishing that a discriminatory reason more likely motivated his employer or indirectly by showing that the employer's proffered explanation for his discharge is unworthy of belief.
The plaintiff contends that he has produced a prima facie case of discrimination because "the admitted reason" for his termination had to do with his workers' compensation case. Urged as conclusive evidence in this regard is the pink slip with its entry of "one year w/comp disability per union contract." Assuming the plaintiff's prima facie case to be as claimed, the court must consider the defendant's evidence of a legitimate, non discriminatory reason for the plaintiff's termination. The defendant points to a uniform application of article 9.1. In the list of people terminated after one year because of 9.1 were five street and road workers, five police officers, one person from Day Care, the plaintiff and another from Sanitation and five people from Water Pollution Control. This evidence, in the court's view justifies proceeding to what Ford v. Blue Cross Blue Shield of Connecticut, Inc., supra termed the "new level of specificity" and what this court described as the plaintiff's ultimate burden. Whether or not the plaintiff has proven discrimination must be decided with reference to the two cases that succeeded Ford, Chiaia v. Pepperidge Farm, Inc., 24 Conn. App. 362, cert. denied 219 Conn. 907 (1991) and Erisoty v. MerrowMachine Co., 34 Conn. App. 708, cert. denied 231 Conn. 908
(1994).
The issues in Chiaia v. Pepperidge Farm, Inc. supra are substantially similar to those being litigated here. The plaintiffs, who were workers' compensation claimants, had been discharged for the reason that they were unable to resume work within one year in contravention of their employer's absence control policy. There was no contention of discrimination in fact. Instead, the plaintiffs asserted that § 31-290a[3]
made the absence control policy discriminatory, in and of itself, when applied to workers' compensation claimants.
Basically, the response of the Appellate Court in Chiaia was two-fold. First, Ford v. Blue Cross Blue Shield of Connecticut,CT Page 8167supra at 52 was cited for the proposition that § 31-290a is a statutorily created tort derived from the action for wrongful discharge formulated in Sheets v. Teddy's Frosted Foods, Inc.,179 Conn. 471, 475-80 (1980). Second, and perhaps more important in precedential value, was the holding that to establish discrimination in violation of § 31-290a the plaintiffs could not rely upon the defendant's neutrally applied absence control policy but had to produce some proof of an improper motive on the part of the employer. 24 Conn. App. at 365-66.
Erisoty v. Merrow Machine Co., supra repeats Chiaia's holding that unless a plaintiff presents some evidence from which a court could infer that the employer had a discriminatory intent when employment was terminated, there would be no contravention of § 31-290a. Also taken from Chiaia, supra at 366-67, with supporting citations from other jurisdictions is the court's statement that "§ 31-290a does not require an employer to retain an employee unable to perform his or her work simply because that inability resulted from a work-related injury or illness." 34 Conn. App. at 713.[4]
The plaintiff argues that Chiaia [and Erisoty] are not controlling in that discrimination has been established. His syllogistic reasoning is that § 9.1 of the union contract applies only to employees who sustain work-related injuries and that the defendant has admitted to a difference in treatment of workers whose injuries are compensable and workers whose injuries are not. From what has already been written, it is obvious that employees with work-related injuries receive a greater benefit. To be objectionable, however, the discrimination must be one that cannot be justified by some natural and substantial difference that is germane to the subject. Francis v. Fitzpatrick, 129 Conn. 619,623 (1943). The work-related nature of an injury alone would support the difference. Moreover, if actionable discrimination should exist due to article 9.1, the plaintiff belongs to the class benefitted [benefited] rather than harmed by it.
In an effort to show discrimination, the plaintiff attempts to link § 31-290a with § 31-313. The latter statute, in brief, provides for a transfer of an employee who is; disabled from performing his customary job to work that is suitable to his physical condition if such work exists and where such a transfer does not conflict with a collective bargaining agreement. As interpreted by Chiaia v. Pepperidge Farm, Inc., supra at 368-69, § 31-313 imposes a duty on the employer to provide suitable CT Page 8168 work for the injured employee only if such work is available. On the other hand, if suitable work is not available, the employer, apart from contractual rights or company policy, is free to discharge the employee in line with the neutral operation of an absence control policy even though the employee is a workers' compensation claimant.
A linkage between §§ 31-290a and 31-313 is not warranted by the facts of this case.; The plaintiff's testimony about suitable employment in the sanitation division, the park department and elsewhere was vague. The availability of suitable work was never established. For example, the plaintiff desired to return to work as a truck driver, a job that was permitted by Dr. Connair. Specifically, he wanted to drive the rack truck displacing one Julie Ardito who he said had less seniority. Under articles 6 and 7 of the agreement between the defendant and AFSCME (collective bargaining agreement), however, seniority operates only in situations of lay-offs, rehirings and vacancies. There is no provision in the agreement for automatic transfers between departments. Any vacancy must be posted and made available to bargaining unit employees before advertising for outsiders. Further, in the sanitation division, at least in 1990-91, there was no position for a full time truck driver and anyone who drove a truck was also a hauler. Finally, there is nothing in § 31-313 that authorizes the displacement of a worker so that an injured employee can be provided with suitable work.
 III.
The court concludes that the facts of this case when interpreted in the light of precedential authority[5] require a judgment for the former employer. Judgment is therefore rendered for the defendant Town of North Haven.
Barnett, J.