[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Tami Perez (Perez), brought this action CT Page 12975 against her employer, The Thomas G. Faria Corporation (Faria), in five counts. All counts have been either stricken or dismissed except for count one which alleges a violation of Connecticut General Statutes § 31-292.
That statute provides as follows:
 No employee who is subject to the provisions of this chapter shall discharge, cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for worker's compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter.
This statute was designed to protect plaintiffs who file for worker's compensation benefits and is in essence a statutorily created tort derived from action for wrongful discharge set forth in Chiaia v. Pepperidge Farms, Inc., 24 Conn. App. 362, 365, 366
(1991). In order to establish a prima facie case under General Statutes § 31-290a, the plaintiff bears the initial burden of demonstrating discrimination by a preponderance of the evidence. Id., at 366. The plaintiff must present some evidence from which a trier of fact could infer that the employer discharged or discriminated against the employee because he or she has exercised his or her rights under the Worker's Compensation Act. Id.
If the plaintiff meets this initial burden, the burden then shifts to the defendant to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its actions. Erisoty v. MerrowMachine Co., 34 Conn. App. 708, 710 (1994). If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and the factual inquiry proceeds to a new level of specificity. Id., at 711. The plaintiff then must satisfy her burden of persuading the fact finder that she was the victim of discrimination either directly by persuading the court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's professed explanation is unworthy of credence. Id.
 Facts
The defendant employed the plaintiff, Tami Perez, on August 26, 1994, as an assembler in defendant's Uncasville plant. She CT Page 12976 started out on first shift, full time at $6.09 per hour. The plaintiff presented evidence that she received a series of hourly pay raises throughout her employment via "Payroll Change Notices". As of August 30, 1996, she was earning $7.99 per hour. The defendant also utilized a formal employee evaluation process that considered several factors including quality of work, knowledge, initiative, efficiency, attitude, judgment, attendance and safety. The plaintiff consistently came in at "satisfactory" or "above-average" on all evaluations. Her last two evaluations, completed by supervisor, Kevin Terry, were basically above-average in all areas and excellent for "attitude".
On or about January 19, 1996, the plaintiff sustained an injury to her right hand on the job. A worker's compensation accident report was prepared on January 23, 1996, which indicated plaintiff's right hand got caught in a flip fixture. The report described injury to the knuckle of the right middle finger. The plaintiff sought treatment on January 23, 1996 at the Montville Health Center. Plaintiff was released to regular duty. Due to continued problems, on February 13, 1996, the plaintiff went to Montville Health Center again and was placed on light duty through February 27, 1996. On March 3, 1996, the plaintiff sought additional medical attention from Dr. Duffield Ashmeade, an orthopedic hand specialist with offices in Hartford, Connecticut. Dr. Ashmeade diagnosed plaintiff with a crush injury and made a series of recommendations, including surgery, should symptoms persist past six weeks. The plaintiff testified that Dr. Ashmeade explained to her that she was seen by him for diagnosis purposes only and not for treatment. She further testified that she complained to Pat Nielson, the defendant's human resources director, about on-going pain. Nielson played a role in setting up this initial visit with Dr. Ashmeade, but did not authorize follow-up visits. Plaintiff testified that due to her injury she continued to work regular duty, but at a limited pace. She testified that she did not seek additional medical treatment because she was afraid of "stirring the water up" with Nielson who she described as being hostile toward her. She was fearful for her job.
The plaintiff did not seek additional medical treatment until nearly a year later, when on February 10, 1997, she was seen again by Dr. Ashmeade. She reported back to Dr. Ashmeade because of increasing discomfort and pain while on the job. Dr. Ashmeade recommended surgery, and surgery was performed on March 17, 1997. As a result of surgery, plaintiff was kept out of work and CT Page 12977 collected worker's compensation lost wage benefits.
On May 14, 1997, Dr. Ashmeade returned plaintiff to half days regular duty then full time on May 21, 1997. The plaintiff testified that upon her return to work, she began to experience additional hostilities with Nielson. She testifies that Nielson would treat her in a degrading manner and expressed disbelief at the extent of her injuries. On May 28, 1997, plaintiff again sought treatment with Dr. Ashmeade and was placed on half time work through June 12, 1997, then full time, and regular duty work. The plaintiff did in fact return to full time regular duty work on June 12, 1997. Upon her return, however, she experienced re-injury to her right hand on two occasions. The first occurred when a drill assembly was cut resulting in the drill falling on her hand. The second occurred when her worktable collapsed. A second worker's compensation report of injury dated May 27, 1997 was prepared by the employer. She saw Dr. Ashmeade on June 17, 1997 and was diagnosed with a fracture of her right little finger metacarpal. She was also restricted to light duty work. Plaintiff testified that she again experienced difficulty with Nielson upon her return. She testified that she was a required to perform repetitive activities, which aggravated her hand. She tried to work the full shift, but was unable. She would leave early and would report this to her supervisor, Ron Nordstrom or to the master assembler. On July 1, 1997, plaintiff again reported to Dr. Ashmeade. His report indicated swelling about the hand and restricted her to clerical work only until the right hand healing progressed. There was no work immediately available for plaintiff. On July 1, 1997, plaintiff received an "official warning" for poor attendance and leaving work.
On July 2, 1997, Nielson prepared a "Memorandum" to Dr. Ashmeade setting out a list of approximately 22 tasks that would be unable for plaintiff. Dr. Ashmeade responded by crossing out some of the tasks and indicated plaintiff could work full time at any combination of the remaining.
Nielson contacted the plaintiff and assigned her the job of assorting small magnets. Plaintiff testified that she was placed in a poorly ventilated, overly hot room to sort the magnets. Her supervisor, Ron Nordstrom, testified that plaintiff was given about 400,000 magnets to sort. He also testified that plaintiff was alone and the room was hot. There were other areas of the plant that were cooled by air conditioning or fans. The plaintiff testified that she had to lift heavy buckets filled with magnets CT Page 12978 and that the lifting and heat aggravated her condition. This activity was not within the list of activities provided by Dr. Ashmeade. Plaintiff was not permitted any help with this assignment. She continued to work, but was unable to complete her shift. On July 16, 1997, Nielson wrote a letter to "UTMC" and stated the following:
 "Worker's Comp Case — I really need to fire this person. Call with guidance Thank, Pat"
Plaintiff further testified that as a result of a stressful work environment that she sought medical attention with Dr. Basu of the Montville health Clinic. Dr. Basu diagnosed her with an ulcer on July 10, 1997 and abdominal pain and anxiety. Dr. Basu kept plaintiff out of work from July 17, 1997 through July 21, 1997 for anxiety.
On July 21, 1997, plaintiff received an official suspension effective July 29, 1997. Ronald Nordstrom, plaintiff's supervisor, testified that a suspension normally went into effect the following day of receipt of suspension. He testified that there was something "wrong" with this "Official suspension" inasmuch that it went into affect some 7 days after issuance. On July 22, 1997, plaintiff again saw Dr. Ashmeade. Dr. Ashmeade's report indicated subsiding swelling, but tenderness along the fifth metacarpal margin.
Plaintiff testified that when she arrived for work on July 28, 1997, that there was no work available for her per Nielson. She further testified that Nielson began swearing at her and slamming doors. Since there was no work, she wanted to start her suspension that day. Nielson became enraged and told her that she could not. Plaintiff did not wish to be treated in such a rough fashion and left the job site. Nielson terminated plaintiff on July 28, 1997. She issued plaintiff a pink slip indicating discharge "for willful misconduct."
Plaintiff testified that she was out of work July 28, 1997 through March 1998. Her earnings, at time of discharge were $9.19 per hour. She found work at The Lodge at the Seaport earning about $6.50 per hour until January 1, 1999 when she received a raise to $10.00 per hour. She also lost medical benefits valued at $233.08 per month. She acquired medical coverage in February, 1999. CT Page 12979
Witnesses for Faria testified that Perez was terminated because of excessive absences and refusal to work a full day (8 hours) after having been cleared for a full day by her doctor. Faria has a policy whereby employees are assigned a certain number of attendance points when they start. If they are late or leave early they lose points. Medical conditions are excused absences and not charged against the employee. If a person's attendance points drops to 18 points, a verbal warning is given. If they drop to 12 points, a written warning is given. If they have only 6 points left, they are given a three day non-paid suspension. Termination is mandated when a person had no attendance points left. Kevin Terry, Tina Rice and Ron Nordstrom all testified that Faria strictly enforces its attendance policy with all of its employees.
Perez was warned about poor attendance and leaving early in July, 1997. She failed to give medical documentation for leaving early several times. She was warned she would lose points is she continued to leave early without documentation. When her points dropped to less that 16, she was issued a warning. She continued to leave early, was suspended and terminated.
 Discussion
The court finds that Perez made out a prima facie case of discrimination because she filed a claim for worker's compensation benefits. The defendant has argued that it has produced evidence of a legitimate non-discriminatory reason for its actions. The court finds that although the attendance policy was followed on the surface, it was not applied in a neutral manner to Perez. No evidence was presented that other employees were terminated in accordance with the policy.
The defendant failed to call the witness most instrumental in Perez's case, Nielson. She was the human resource director dealing directly with the plaintiff and the person who made the decision to terminate her. Nielson refused to give her part time work such as was given to Nancy Harvey, a co-worker called by Perez, at the same time it was refused to her. Harvey also testified that there were other part time workers. Terry also testified part time work was available. The evidence supports the plaintiff's claim that there was part time work, others were assigned to it, but her request was refused. Nielson showed her animus toward Perez and her status as a "worker's compensation case" when she stated she really needed to "fire this person". CT Page 12980 Since Nielson was not called as a witness, the testimony of Perez as to her treatment by Nielson is uncontradicted. The court, therefore, accepts her testimony as to Nielson's discriminatory motives as true. The court finds that Nielson did discriminate against Perez. It also finds the defendant's claim regarding its stated reason for termination is pretextual and not credible. The plaintiff justified her absence and early leaving of work by explaining the type of work she was found to do and the working conditions, especially the job of sorting magnets, alone, in a poorly ventilated, overly hot room. The court accepts her testimony that she was forced to leave work early because of these conditions.
The court, therefore, finds that the defendant did, in fact, terminate the plaintiff in retaliation for having exercised her right under the Workers Compensation Act in violation of Connecticut General Statutes § 31-298.
 Damages
The statute permits a successful plaintiff to be awarded reinstatement on the job, payment of back wages, reestablishment of lost benefits, punitive damages, attorney's fees and any other damages suffered.
The plaintiff is not seeking reinstatement. Accordingly, the court cannot consider back wages or reestablishment of benefits. However, she is entitled to damages for the loss of wages she suffered from her date of termination until she found new employment in March, 1998, a period of seven months. At the time of her discharge, she was earning $367.56 per week. She therefore lost $11,067.95. Her employment in March, 1998 was for $107.54 per week, less than her pay at Faria until January, 1999. Over those 9 months she lost $4,161.80. The court, therefore, finds that she is entitled to a total of $15,224.75.
Under the statute, Connecticut General Statutes § 31-290a, the prevailing employee may be awarded punitive damages and shall be awarded reasonable attorney's fees. Ford v. Blue Cross BlueShield, 216 Conn. 40, 49 (1990).
In this case, to be awarded punitive damages and attorney's fees, the plaintiff must present evidence of the cost of litigation and of the amount of the attorney's fees. Berry v.Loisean, 232 Conn. 786, 825-827 (1992); Vandusleus v. Weil,
CT Page 12981176 Conn. 353, 358 (1978).
Accordingly, judgment will enter for the plaintiff in the amount of $15,224.75. A hearing will be required to determine the amount of reasonable attorney's fees and punitive damages.
D. Michael Hurley, Judge Trial Referee