[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the decision of the Bloomfield Inland Wetlands and Watercourses Commission (hereinafter the "Commission") granting a conditional permit to Landforms, Inc. for the construction of a watercourse crossing and a six-lot subdivision in an inland wetlands area. CT Page 7194
A review of the entire record discloses the following germane facts. The subject parcel of land consists of approximately 34.76 acres located on the west side of Duncaster Road, approximately 1200 feet south of the intersection with Wadhams Road; the parcel contains approximately thirteen acres of regulated inland wetlands and watercourses. The subject property is bisected by a seasonal watercourse which divides the parcel into eastern and western halves; there currently exists on the property a farm crossing which traverses the seasonal watercourse. The western portion of the property is bordered by Griffin Brook which flows in a northerly direction and forms the headwaters for an inland wetland and watercourse system known as "The Great Drain". The permit, as granted by the Commission, allows a six-lot subdivision consisting of four houses on the eastern half and two on the western half.[1] Access to the homes would be by means of a new road entering from Duncaster Road and utilization of the existing farm crossing across the easterly wetlands corridor to the two lots on the western half; Landforms proposed using the farm crossing with a drainage pipe already in place, paving to sixteen feet, and adding two feet of fill on either side of the crossing. The permit, as granted, is subject to ten conditions set out by the Commission, including a conservation easement "subject to the Wetlands Commission approval."
Landforms' proposal first came to the attention of the Commission in late 1988 and early 1989. The initial application proposed nine homes, four on the easterly half, and five on the westerly tract, with a fifty foot right of way crossing the easterly wetlands, twenty-six feet of which would be paved. After a public hearing, the first application was denied without prejudice by the Commission on February 21, 1989, there having been concerns raised regarding the number of homes on the westerly tract and the magnitude of the proposed crossing (with corresponding disruption) of the easterly wetlands.
Landforms submitted the second (present) application on October 2, 1989, which proposed three homes, rather than five, on the westerly half, and the sixteen foot paving of the existing farm crossing (which would result in a disturbed area of approximately 2340 sq. ft., as opposed to 8960 sq. ft. under the 1988 application).[2]
Landforms' second application is dated October 2, 1989, and is inscribed as received at the Bloomfield Town Hall on that date. The official date of receipt by the Commission is shown as October 16, 1989, and the application was "scheduled for review by the [Commission] on October 16, 1989." Notice of the October 16, hearing was published on October 6 and October CT Page 7195 13, 1989, as required by General Statutes Section 22a-42a(c). The applicant was notified by certified mail, and the Commission also notified abutting owners by letter dated October 4, 1989.[3]
The hearing went forward on October 16, 1989, and further hearings were conducted on November 16 and November 20, 1989; on the latter date, after hearing substantial evidence and extensive comment, the Commission granted the application, subject, as stated, to ten conditions.
At the commencement of the October 16 hearing, counsel for the plaintiffs/intervenors[4] objected to going forward on the merits, referring to Section 22a-42a(c) (and, also, Section 6.4 of the Bloomfield regulations), asserting that a public hearing could not be scheduled until the application was first "received" by the Commission. Counsel's objection was duly noted and overruled by the Commission at that time, the Chairman stating that the Commission had the right to have a public hearing on the date it "received" an application, that it regularly delegated to staff the scheduling of a hearing when an application was clearly a public hearing matter, and that to do otherwise would simply result in "essentially a wasted meeting", putting "things off for too long". The Chairman pointed out that the intervenors would not be deprived of sufficient time to prepare as the hearing on this application would not be completed on October 16, but would require one or more adjourned hearings to finalize the presentation. Thus, the hearing proceeded on the merits, the intervenors preserving their rights with respect to this procedural question.
On October 16, counsel for the applicant, Landforms, offered its evidence. Most of that presentation involved the testimony of Mr. Ed Lally, a licensed professional engineer and land surveyor; on behalf of Landforms, Mr. Lally presented extensive information regarding the second proposal and, specifically, the claimed less intrusive crossing of the easterly wetlands corridor. Additionally, the applicant's field biologist, Mr. David M. Darnell, of Environmental Planning Services, testified regarding the nature and quality of both the eastern and western wetland areas, observing generally that, in his view, the higher quality wetland was the western portion along Griffin Brook; the expert concurred with Michael Klein, Environmental Planning Services' principal, that the eastern area was a lower quality wildlife habitat of much more limited wetland value than the acreage to the west. With regard to the westerly corridor, the Klein report stated that the applicant's three lot proposal would have no direct adverse impact on Griffin Brook, and merely a negligible indirect impact; similarly, Mr. Darnell testified that the development of the three lots to the west would only minimally impact on the wetland, and have no significant impact on the wildlife habitat. CT Page 7196 Members of the Commission, and the intervenors' counsel, questioned Mr. Lally, Mr. Darnell, and also Mr. Hixon, a principal in the applicant corporation, thoroughly and at considerable length.
On November 6, 1989, Mr. Darnell completed his presentation; there was further questioning, and, thereafter, the intervenor's presented their position in opposition to the application. Counsel for the intervenors contended that the October application was "nothing more than a cut and paste job" of the earlier one, the westerly reduction from five lots to three was minimal in terms of environmental impact, the statutory requirement of no feasible and prudent alternative had not been addressed, that in spite of the proposed conservation easement there "still remained significant gaps and questions" (particularly with regard to the impact resulting from human habitation and the difficulty in enforcement of easement terms), and, although properly a question for the Town Planning Zoning Commission, the subdivision reflected "false frontages" in that the frontage on the exterior roadways was entirely wetland which provided no ingress or egress to and from the buildable portions of the lots. The intervenors presented their expert, Virginia Burkhardt, Burkhardt Environmental, Inc., who voiced great concern over the long-term impact of residential habitation on the regulated portion of the tract. However, while recognizing that the intervenors took the position that no development should be permitted on the western portion, Ms. Burkhardt acknowledged that "probably two houses could be very reasonably done in that type of area with very stringent restrictions." This expert insisted that the "details" of such "very stringent" restrictions, and a "very clear definition of [those] restrictions," had not been offered by the applicant. The intervenors maintained the applicant had failed to prove the nonexistence of a feasible and prudent alternative. Counsel stated that Landforms had not proved that there existed no physical way it could reduce its proposed encroachment on a unique wetland and wildlife habitat without making the project economically infeasible.
At the hearings, there was considerable discussion concerning the proposed crossing to the western area. Also, Mr. Lally testified regarding the increased per lot costs if Landforms was forced to develop a lesser number of lots. Members of the public, including abutting owners, were permitted to, and did, direct remarks to the Commission. The experts who had testified were questioned extensively by the attorneys representing the various interests, and also by the Commission members.
At the November 20 hearing, the Commission heard CT Page 7197 additional comments from staff, the attorneys, and members of the public; staff generally concurred with the concept of a conservation easement, provided steps were implemented to inform prospective homeowners of the terms thereof, and of the necessity of protecting the wetland areas. Counsel for the intervenor emphasized the difficulty of enforcement in a development of this type and again stressed the applicant's failure to establish the nonexistence of any feasible and prudent alternative.
Throughout the proceedings, reports and documentation were submitted to the Commission by staff and various agency experts. Such documentation included the staff report from Mr. Jack Kazmarski, Bloomfield Public Works Director;[5] the 1/9/89 report of the Hartford County Soil Conservation Service relating to the relocation of a barn near the entrance road (this report was incorporated in the Kazmarski report and read into the record), and the report from the Bloomfield Health Department regarding the acceptability of soil for proposed septic systems. Reference was made to a letter the Commission had received, at the time of the hearing on the initial application, from Mr. Kenneth Metzler, Senior Biologist, Natural Resources Center, Department of Environmental Protection and, on November 6, Ms. Burkhardt was questioned on whether Landforms' second application conformed with all of Mr. Metzler's requirements for a "positive effect" on the protection of the Griffin Brook watershed and the Great Drain; the expert acknowledged that it did so conform. Additionally, the Commission had for its consideration: the Environmental Evaluation prepared by Environmental Planning Services; the submissions of Burkhardt Environmental, Inc.; the written presentation of the intervenors; an Analysis of Proposed Conservation Easement, submitted by the intervenors' attorney; the Drainage Design Calculations, Griffin Brook, prepared for Landforms, Inc., revised to 10/27/89; and, a Brief (with impeachment material relating to the Burkhardt analysis) submitted by Landforms' attorney.
On November 20, 1989, the Commission, after extended discussion, granted Landforms a permit to construct a six lot subdivision, subject to ten conditions; notice of the Commission's decision was published in the Bloomfield Journal on December 1, 1989, in accordance with the requirements of General Statutes Section 22a-42a(d). Among the ten conditions placed on the granting of the permit were the following: (a) approval of only a six lot subdivision; (b) approval based on plans revised to 11/8/89; (c) a conservation easement subject to Wetlands Commission approval; (d) lot #3 (westerly half) to be eliminated and the land which would have been lot #3 to be part of the conservation easement; and, (e) as the "proposed conservation CT Page 7198 easements are necessary to protect this area", the "Soil Conservation Service recommends that potential homeowners be made aware of this by placing in bold letters on the subdivision plan filed on the land records the guidelines for protecting the wetlands."[6]
The instant appeal was filed by the intervenors on December 26, 1989; three grounds are pressed: (1) the October 16, 1989 hearing was illegal because it was held on the "day of receipt" of Landforms' application; (2) the Commission acted illegally, or in abuse of its discretion, by granting the permit because Landforms' failed to prove that there existed no feasible and prudent alternative, and/or, by not specifically finding, based upon substantial evidence, that no feasible and prudent alternative existed to the proposed action; and, (3) the Commission abused its discretion in that the Great Drain is a "wetland of special concern" and, therefore, no development whatsoever should be permitted on the western half.
A. Jurisdiction
To take advantage of a statutory right to appeal from a decision of an administrative agency, there must be strict compliance with the statutory provisions which created that right. Simko v. Zoning Board of Appeals, 206 Conn. 374, 377
(1988). The provisions are mandatory and jurisdictional; failure to comply subjects an appeal to dismissal. Id.
1. Aggrievement
General Statutes Section 22a-43 (a) provides, in pertinent part, ". . .any person owning or occupying land which abuts any portion of land . . . involved in any . . . decision or action made pursuant to said sections may appeal to the superior court in accordance with the provisions of Section 4-183, except venue shall be in the judicial district where the land affected is located . . ." In granting a permit to conduct regulated activities upon wetlands or watercourses, the Commission acts pursuant to Section 22a-42a.
The appellants, as abutting owners, are statutorily aggrieved and may appeal pursuant to General Statutes Section22a-43 (a).[7]
2. Timeliness
General Statutes Section 4-183 requires an appeal to be brought within forty-five days of the mailing of the final decision. The instant appeal was commenced by service on December 21, 1989, and was filed with the Clerk on December 29, CT Page 7199 1989. Said dates are respectively thirty-one and thirty-nine days after the Commission's November 20, decision. Accordingly, this appeal is timely filed.
B. Scope of Review
The authority of an inland wetlands agency is extremely limited; it considers only matters which impact on designated wetlands areas. Connecticut Fund for the Environment, Inc. v. Stamford, 192 Conn. 247, 250 (1984); Tanner v. Conservation Commission, 15 Conn. App. 336, 339 (1988). On appeal to the Superior Court, the agency action is to be sustained if an examination of the record discloses evidence supporting any one of the reasons given for the administrative decision. Huck v. Inland Wetlands Watercourses Agency,203 Conn. 525, 540 (1987). However, the evidence to support any such reason must be "substantial"; that is, the standard which "the reviewing court must apply in determining whether the . . decision should be sustained is referred to as the substantial evidence rule." Huck v. Inland Wetlands Watercourses Agency, supra; Tanner v. Conservation Commission, supra. The rule has been explained repeatedly, as follows:
 "`This so called substantial evidence rule is similar to the "sufficiency of the evidence" standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred . . .[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury" . . . "The `substantial evidence rule' is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility
 in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breath as is entirely consistent with effective administration. . . [It] imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . CT Page 7200 and to provide a more restrictive standard of review than standards embodying review of `weight of evidence' or `clearly erroneous' action . . .'." 203 Conn. at p. 541 15 Conn. App. at p. 339
As stated in both Huck and Tanner, the United States Supreme Court, "in defining `substantial evidence' in the `directed verdict' formulation, . . said that it `is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Id. With regard to questions of fact, it is not the proper function of the reviewing court to retry the case or substitute its judgment for that of the administrative tribunal. Intervale Homeowners Assn. v. Environmental Protection Board, 19 Conn. App. 334, 337 (1989).
C. Merits
1. Legality of Public Hearing — "Day of Receipt"
The controlling statute is Section 22a-42a(c); it provides, in relevant part, that "[n]o later than sixty-five days after the receipt of [an] application, the inland wetlands agency may hold a public hearing on such application". Similarly, Section 6.4 of the Bloomfield Inland Wetlands and Watercourses Regulations states: "Public hearings shall be held no later than sixty-five (65) days after the official date of receipt of the application." The day of receipt of an application is defined by Section 22a-42a(c) as either the day of the next regularly scheduled meeting or thirty-five days after submission of the application, whichever is sooner. Plaintiffs contend that the word "after" as used in the statute, and the local regulation, precludes the Commission from holding its hearing on the day of receipt, that is, on the date of its next regularly scheduled meeting immediately following the day of submission (if that meeting is within thirty-five days of the submission of the application).
It is basic that "an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner", and such body "cannot modify, abridge or otherwise change the statutory provisions, under which it acquires authority unless the statutes expressly grant it that power." Castro v. Viera, 207 Conn. 420, 428
(1988). And, it is also fundamental that "[w]hen the language used in a statute is clear and unambiguous, its meaning is not subject to modification or construction". Ford v. Blue Cross 
CT Page 7201 Blue Shield of Connecticut, Inc., 216 Conn. 40, 63 (1990). Here, the operative statute, Section 22a-42a(c), is clear in that it merely sets an outer limit within which time period the Commission must act, that is, within which period it may hold a hearing on an application.
Ever assuming, arguendo, that the language of Section22a-42a(c) is ambiguous, "an administrative agency's interpretation of a statute is ordinarily an aid to its construction and should be accorded great weight"; Breen v. Department of Liquor Control, 2 Conn. App. 628, 634 (1984); this principle has application "in cases where the statutory language is ambiguous, the legislative history is unenlightening and the `governmental agency's time-tested interpretation is reasonable.'" Furthermore, "[t]he unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of [a statute] is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable." Maciejewski v. West Hartford, 194 Conn. 139,151-52 (1984).
Here, an examination of the legislative history fails to provide enlightenment on the procedural issue raised by plaintiffs. And, the Commission Chairman's statement regarding the agency's interpretation, and the agency practice which has been implemented predicated upon that interpretation, would appear to be entirely reasonable: ". . .we believe — my interpretation of the statute is [that] we have the right to have a public hearing on the day we receive an application . . . we have . . delegated to our staff the authority [,] when an application is clearly a public hearing matter, to . . . schedule . . a public hearing and . . avoid the need to come here for essentially a wasted meeting and put things off for too long on that basis."[8] In the court's view, the Commission's position is a perfectly reasonable one for these reasons: (1) the plaintiffs' interpretation would require that a meeting be held solely for the purpose of "receiving" the application and the scheduling of a future hearing; and, (2) if the Commission did not hold its "next regularly scheduled" meeting within thirty-five days of submission, the "day or receipt" would be established through no action by the Commission, but by operation of law. With respect to (2) above, since the statute allows the Commission to hold a hearing on the merits of an application after the expiration of thirty-five days from the date of submission, without first requiring a separate meeting to "receive" that application, it is a perfectly reasonable interpretation that where a Commission chooses to act before the statutory imposition of a day of receipt, (i.e. within thirty-five days of submission), it is not required to hold a meeting for the sole purpose of just receiving the application CT Page 7202 and scheduling a hearing thereon.
The fact that the public hearing in this case commenced on the statutory "date of receipt" did not deprive plaintiff/intervenors of an opportunity for meaningful preparation. Notice of the hearing was published in accordance with the statute, and was mailed to the abutters and to the applicant. As defendants point out, no public policy would be served by merely "receiving" the application on October 16, 1989 and thereby occasioning additional, unnecessary delay in reaching the merits of the second application. Plaintiffs cannot claim prejudice, having been given lawful notice of the hearings, and having participated fully and vigorously at all of the hearings conducted on this application.
As stated, Section 22a-42a(c), in the court's view, specifically sets an outer limit with respect to the time period in which the Commission may conduct a hearing: "[n]o later than sixty-five days after receipt of such application." The provision serves to establish an expeditious procedure for the processing of, and reaching of decisions on, applications pending before the Commission. The statutory "date of receipt" is the starting point; if a public hearing is to be held, it is to be held within sixty-five days of "receipt"; and, if the Commission does not hold a public hearing, it must reach a decision on the application within sixty-five days of said receipt. If a hearing is held, it must be completed within forty-five days of its commencement, and a decision reached within thirty-five days of completion of said hearing (unless the applicant consents to an extension). While the timely procedure ordained by the statute directs that a hearing be held within sixty-five days of receipt (if a hearing is to be held), it does not mandate that the hearing on the application be delayed pending the conducting of a formal hearing to "receive" the application. As stated, upon a reading of the statute in its entirety, it clearly serves "to secure a prompt and systematic dispatch of the proceedings" on the application. 18 Conn. App. infra at p. 449. There is nothing in the provision which reasonably suggests that the failure of the Commission to hold a separate, preliminary hearing to formally "receive" the application would carry any sanction or operate to deprive the Commission of jurisdiction to conduct a hearing on the merits of the application. "It is well settled that one of the more reliable guides in determining whether a statutory provision is directory or mandatory is whether the provision is accompanied by language that expressly invalidates any action taken after noncompliance with the provision." Ruotolo v. Inland Wetlands Agency, 18 Conn. App. 440, 448 (1989).[9]
The court concludes that the Commission did not exceed CT Page 7203 its statutory authority by its commencement of the hearing on Landforms' application on the statutorily defined "date of receipt".
2. No Feasible and Prudent Alternative
General Statutes Section 22a-42a(d) states that "[i]n granting, denying or limiting any permit for a regulated activity the inland wetlands agency shall consider the factors set forth in Section 22a-41, and such agency shall state upon the record the reason for its decision." Section 22a-41 (b) provides:
 "In the case of an application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. In making his findings the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and the reasons therefore shall be stated on the record." (Emphasis added)
Section 22a-41 (a)(2) requires the Commissioner, "[i]n carrying out the purposes and policies of sections 22a-36 to 22a-45, inclusive, . .[to] take into consideration all relevant facts and circumstances, including but not limited to . . the alternatives to the proposed action." A feasible and prudent alternative is one that is physically capable of being accomplished and is economically reasonable in light of the social benefits derived from the property. Manchester Environmental Coalition v. Stockton, 184 Conn. 51, 62-63 (1981).
In considering alternatives to the proposed action, the Commission should take into account the purpose of the Wetlands Act: "to protect and preserve inland wetlands and watercourses `by providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology.'" Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. 710,719 (1989). The interests of the private landowner who wishes to make productive use of his property is appropriately to be considered by the Commission in rendering its decision. Id.
The Commission's determination must be based upon "substantial evidence". Huck v. Inland Wetlands Watercourses Agency, supra. Here, defendants contend that where the reasons for the Commission's decision are in question, or unstated, the CT Page 7204 court may search the record to determine whether it contains an adequate basis supporting the Commission's ruling; they rely on Gagnon v. Inland Wetlands Watercourses Commission, 213 Conn. 604,605 (1990). Defendants maintain that where a review of the entire record discloses a basis for the administrative decision which is supported by the substantial evidence, the decision must by sustained. Huck v. Inland Wetlands Watercourse Agency, supra at p. 539-40.
Relying on Gagnon defendants urge the court to review the administrative record regarding the statutory requirement of "no feasible and prudent alternative". Plaintiffs object, asserting that Gagnon is distinguishable, and that the administrative law doctrine of "primary jurisdiction" precludes such review. The court is unpersuaded by plaintiffs' efforts to distinguish Gagnon. Plaintiffs have argued that the Supreme Court's holding in Gagnon pertained only to Section 22a-42a(d), and did not relate to the specific finding required by Section22a-41(b); however, Section 22a-42a(d), which requires the agency to state the reasons for its decision on the record, compels the agency to consider the factors set forth in Section22a-41 (not just 22a-41(a)), and in footnoting the statutory factors to be considered, our Supreme Court has set forth all of Section 22a-41, including subsection (b). See:213 Conn. at p. 606, fn. 2. Particularly relevant as good reason for searching the administrative record is the following observation of Justice Hull in Gagnon:
 "The most cogent argument, however, is the public policy argument that a local land use body is composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate. The case law requiring the trial court on appeal to search the record for the agency's reason for its decision is a practical and fair reaction to this scenario. We conclude that the trial court erred in sustaining the plaintiff's appeal because the inland wetlands commission did not state on the record the reasons for its decision." Id. at p. 611
The court thus concludes that the Gagnon decision has application here and that a review of the entire record is both permissible and appropriate.[10]
With regard to the principle of primary jurisdiction, plaintiffs have not bypassed an administrative determination, and by reviewing the record in accordance with Gagnon, the court CT Page 7205 does not make an independent ultimate finding, but merely ascertains whether there exists substantial evidence supporting the statutorily required finding necessarily implicit in the agency's decision granting the application. The Supreme Court has referred to the circumstances giving rise to the application of the doctrine of primary jurisdiction, as follows:
 ". .primary jurisdiction situations arise of cases where a plaintiff, in the absence of pending administrative proceedings, invokes the original jurisdiction of a court to decide the merits of a controversy. We describe the circumstances herein as a primary jurisdiction case because the plaintiffs, prior to the filing of their complaint, had sought no administrative action." (Emphasis added). Sharkey v. Stamford, 196 Conn. 253, 256 (1985)
The primary jurisdiction doctrine does not preclude the court from reviewing the entire record as per Gagnon.
A review of the record reveals that the Commission both considered the existence of feasible and prudent alternatives, including the alternative of no development, and made its ultimate decision based upon substantial evidence.
At the November 6, 1989 hearing, the plaintiffs presented the expert testimony of Ms. Burkhardt, of Burkhardt Environmental, to address their main concern of development in the western half of the parcel. The Commission questioned Ms. Burkhardt at length and very incisively regarding such development. Among the options discussed were: no development, development of three houses, and development of two houses. As stated, in response to these questions Ms. Burkhardt stated "I think that probably two houses could be very reasonable done in that type of area with very stringent restrictions . . ."
As defendants point out, the Commission had rejected the first application as too intrusive; the evidence presented at the hearings on this present application fairly demonstrated that the second proposal was formulated to address, and did satisfy, the prior concerns of staff, the DEP, Hartford County Soil Service, etc. In addition thereto, there was the testimony of Mr. Lally that without the development of the westerly tract, the entire project would be economically infeasible.[11] In the court's view, the entire record clearly indicates that the Commission, from the outset, considered the alternatives to Landforms' proposals, including that of no development on the western portion; further, both the record and the Commission's ultimate decision CT Page 7206 substantiate a conclusion that the development of two houses in the western half, as opposed to the three houses requested, was the only feasible and prudent alternative to the applicant's proposed plan.[12] The Commission fulfilled its statutory obligation to consider the existence of feasible and prudent alternatives. And, a review of the entire record indicates the Commission's ultimate approval of a conditional permit to construct six homes in a wetland area was based upon substantial evidence.
Relying on language in the Commissioner's Final Decision captioned In The Matter Of Applications Of Paul Kovacs, Et Al., Connecticut Department of Environmental Protection, Application No. IW-88-205, March 21, 1990, p. 6-7, plaintiffs further contend that the Commission's decision here was illegal because of the applicant's failure to assume and satisfy the burden of proving the nonexistence of any feasible and prudent alternatives. While it is clear that the Commission under Section 22a-41(b) must consider whether any feasible and prudent alternatives exist, and that the administrative record, when reviewed pursuant to Gagnon, must contain substantial evidence which would support a finding of no feasible and prudent alternatives, it is not apparent that the applicant necessarily has the burden of proving their nonexistence. cf. Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. supra, at 726 (1989). In Kovacs, the DEP relied on Huck v. Inland Wetlands and Watercourses Agency, supra; however, in the Huck case the Court stated that "under the circumstances of this case, the trial court was in error here insofar as it placed the burden on the agency to demonstrate that there were alternatives in this case." 203 Conn. at p. 553. (Emphasis added). And, in an explanatory footnote the court pointed out that the applicant, by alleging that no alternatives existed, affirmatively assumed that burden. Id. at p. 553, fn. 18. Neither Huck, nor Kovacs reliance thereon, establishes a general principle of law that an applicant has the burden of proving the nonexistence of alternatives, and that an applicant's failure in assuming that burden will, in and of itself, render the agency decision unlawful.
Accordingly, the court concludes, with respect to the requirement imposed by Section 22a-41(b), that plaintiffs have not established that the Commission's granting of this application was illegal or in abuse of its administrative discretion.
3. The Great Drain — "Wetland Of Special Concern"
Plaintiffs further maintain that even if the record supports a finding of no feasible and prudent alternative, no CT Page 7207 activity having a direct, adverse impact on the Great Drain should be permitted; plaintiffs argue: "[t]he qualities of this wetland `of special concern' make it worthy of special protection as envisaged by the Connecticut Inland Wetlands and Watercourses Act."
As plaintiffs point out, the western portion of this parcel belongs to a continuous wetlands system which lies upstream of the Great Drain; however, as defendants stress, the westerly tract does not lie within the Great Drain or any wetlands contributing to it, but within an area which is regulated because it buffers those wetlands. Defendants argue, convincingly, that plaintiffs' own expert testified two homes could be "very reasonably done" on the westerly tract (with stringent restrictions), and that by approving only two lots on the westerly portion, and transferring the proposed third lot to the large conservation easement that buffers the wetlands, the Commission approved a proposal that plaintiffs' expert apparently believed would not have a significant adverse effect on the Great Drain.
It is an indubitable fact, as this record clearly establishes, that all components of the Great Drain comprise an exceedingly valuable wetlands/watercourse system. Furthermore, as the Act states, "[t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed". (Emphasis added). General Statutes Section22a-36. Nevertheless, where the decision of the local administrative body is supported by substantial evidence of record, that decision upon review must stand; it is not the proper function of the reviewing court to substitute its judgment for that of the administrative agency. Intervale Homeowners Assn. v. Environmental Protection Board, supra at p. 337. And, as heretofore quoted from Huck, "`[a]gainst [the] laudable state policy. . .must be balanced the interests of the private landowner who wishes to make productive use of his wetland.'"203 Conn. at p. 552 (quoting Brecciaroli v. Commissioner of Environmental Protection, 168 Conn. 349, 354 (1975)).
The record includes a letter dated October 24, 1989 in which the Connecticut Department of Environmental Protection state that "[a]ll wetlands are of special concern and any proposed use must be carefully considered and evaluated, but, that there is no official state category, class or title designating a `wetland of special concern,' [and that] [t]he State does not use the title for any wetlands in Connecticut." Furthermore, the DEP noted that this designation did not in any way interfere with the Commission's normal review and decision-making process. CT Page 7208
It is concluded that the wetland area known as "The Great Drain" is entitled to the same consideration as any other wetland area. Here, the Commission fulfilled all of its statutorily mandated obligations and duties in considering the importance of this area as a wetland; therefore, the Commission's decision should not be disturbed because of any reference to the Great Drain as a "wetland of special concern".
D. Conclusion
For the reasons stated, the instant appeal is hereby dismissed.
Mulcahy, J.
Footnotes