[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
REPORT OF ATTORNEY TRIAL REFEREE
I. FINDINGS OF FACT
1. The Plaintiff, a long time gun collector owning an extensive collection, purchased three semi-automatic rifles in April of 1986 from Ron's Gun's (Plaintiff's Ex. 18) for conversion to fully automatic machine guns and based upon Ron Rando's recommendation (the owner of Ron's Gun's), the Plaintiff contacted the Defendant on or about April 16, 1986 to discuss and arrange for such conversions.
2. The Bureau of Alcohol, Firearms and Tobacco (hereinafter BATF), a division of the United States Department of the Treasury regulates the sale and transfer of certain weapons, referred to as Title Two weapons, through a permitting tax stamp process. Semi-automatic weapons are referred to as Title One weapons and upon conversion to fully automatic weapons, they become Title Two weapons. Title TWO weapons are required to be registered with the BATF under the National Firearms Act (26 USCS 5801 et seq., hereinafter NFA). Such registration is made after sufficient conversion work is done on a Title One weapon to qualify it as a Title Two weapon, by the filing of a Form 2 with the BATF and payment of the necessary transfer fees. Upon BATF approval of a Form 2, such weapon becomes an NFA weapon, it can then only be CT Page 8078 further transferred by the owner to whom it has been registered on the Form 2, to another dealer or individual, upon the filing and approval by the BATF of a Form 4 (together with necessary fees). Only upon BATF approval of a Form 4 can a licensed dealer transfer an NFA weapon to another dealer or individual. Licensed dealers are required to keep written records for inspection by the BATF of all acquisitions, remanufactures and dispositions of NFA weapons (hereinafter NFA registry).
3. It is the custom and usage in the trade for the transferor of an NFA weapon to submit Form 4's to the BATF for approval, after completion of the Form 4 by the proposed transferee.
4. On April 16, 1986, the Plaintiff delivered to the Defendant's place of business the three semi-automatic rifles purchased by him from Ron's Gun's; after discussing with William Wittstein (hereinafter Wittstein), the President of the Defendant, various options for conversion of the semi-automatic rifles into fully automatic weapons, he left the weapons with the Defendant for conversion.
5. At this initial meeting, Wittstein, who was President of the Defendant-corporation and at all times authorized to speak on behalf of Defendant, indicated that the length of time for delivery of the converted weapons to Plaintiff would be governed by how long it took the BATF to do the paperwork. Wittstein told the Plaintiff this process was slow and could take as much as a year. (T., 11/27/90, p. 18)
6. At this initial meeting, Wittstein said nothing to the Plaintiff about the length of time it would take to do the conversion work on Plaintiff's rifles; nor did Wittstein indicate that he was swamped with the delivery of weapons to him in April of 1986 by other customers, for conversions of semi-automatic to fully automatic weapons.
7. The Plaintiff, at the time of the delivery of his rifles to the Defendant, was aware of a pending change in federal legislation which would ban the future manufacture and distribution of fully automatic weapons to private persons and this prompted him to go to the Plaintiff in April of 1986 for the conversion of his three semi-automatic rifles. The cut-off date for such conversions was May 19, 1986 and although the Defendant had a far larger number of weapons delivered to him in April and May of 1986 for conversion than was usual for him, neither Wittstein nor any other agent or employee ever told the Plaintiff that the volume of conversion work itself would delay delivery to the Plaintiff of his weapons, even after the BATF approval was secured.
8. Wittstein initially thought the three rifles delivered by CT Page 8079 the Plaintiff had been brought to him by Ron's Gun's and in his NFA registry logged them in under the name Ron's Gun's (Ex. 20G, page 25 Acquisition, lines 27, 28, 29). On the same date (e.g. April 16, 1986) the Plaintiff delivered these three rifles, the Defendant performed a sufficient amount of remanufacturing work on them so as to make them registerable as Title Two fully automatic weapons, and Defendant so reflected such conversion in his NFA Registry (Plaintiff's Ex. 20G, p. 25, Disposition, lines 27, 28, 29).
9. Only a couple of hours of work was required to make the Plaintiff's three rifles registerable as NFA Title Two weapons, but thereafter, approximately ten hours of additional work per weapon was required to complete the remanufacturing process of each rifle into a fully automatic weapon, with the new features ordered by the Plaintiff. The Plaintiff was not familiar with how long the conversion work would take, assumed it would be done while BATF approval was being sought and was never told otherwise by the Defendant, or its agents or employees.
10. The Plaintiff did not pay the Defendant until December 22, 1986 for the conversion work on the Three rifles, at which time the Plaintiff returned to Defendant's place of business and delivered to Defendant the three Form 4's which he had completed after they had been signed and sent to him by Valerie Wittstein (Vice President of the Defendant). The Plaintiff also decided, on that date, to purchase a Project C Suppressor from the Defendant; therefore an additional Form 4 was given to him at that time for completion and return to the Defendant for processing with the BATF.
11. On said date, December 22, 1986, the Plaintiff fully paid the Defendant for conversion of the three rifles and for the Project C suppressor and paid for all BATF tax stamps and sales taxes and the Defendant provided to Plaintiff an order acknowledgment form. (Plaintiff's Ex. 4) The order acknowledgment form identifies the Project C Suppressor purchased by a serial number (#S-0708), which was also inserted on the Form 4 furnished to Plaintiff (Plaintiff's Ex. 5).
12. The order acknowledgment form furnished to the Plaintiff (Plaintiff's Ex. 4) indicated delivery of the three rifles and Project C Suppressor to the Plaintiff was to be ASAP. ASAP meant "as soon as possible" to both the Plaintiff and Defendant; and "as soon as possible" was understood by both Plaintiff and Defendant to be as soon as the BATF paperwork was completed.
13. Because the Defendant never advised the Plaintiff in April of 1986, December of 1986, or thereafter, that substantial work orders would delay complete conversion of the weapon with the features ordered by the Plaintiff for redelivery to the Plaintiff, and in fact, only stated that BATF paper work would slow things up, CT Page 8080 the Plaintiff could reasonably have expected that "ASAP" meant conversion would be completed within the time the BATF took to process Plaintiff's application forms.
14. It was customary procedure in the trade for the Form 4 paper work to be handled as follows: the dealers-transferors prepared the Form 4's for their prospective transferees; after the transferor had done so, then the transferee would complete the Form 4's by taking passport photos, obtaining multiple fingerprint cards made up by the local police department, securing approval of the local police and a FBI criminal record check and then returning these forms together with the tax transfer check to the transferor for processing with the BATF. This was also Defendant's customary way of handling the processing of Form 4's. The process of securing these items and approvals by a transferee is time consuming.
15. The Plaintiff returned the Form 4 for the Project C suppressor purchased on December 22, 1986 (Plaintiff's Ex. 4 — fourth item) to the Defendant by mail, in January of 1987; the Defendant claims never to have received it but at no time did Defendant so advise the Plaintiff during any of the numerous monthly phone calls made by the Plaintiff to Defendant between May of 1987 — March 1988 and a reasonable inference can be drawn that the Defendant misplaced this Form 4.
16. BATF approval was obtained on March 10, 1987 for the Plaintiff's three rifles to be transferred by the Defendant to the Plaintiff and the Defendant received approved transfer forms from the BATF shortly thereafter. (Plaintiff's Ex. 1, 2 and 3; T., 11/28/90, pp. 129-130).
17. Between March 1987 and March 1988, the Plaintiff called the Defendant's place of business on a monthly basis, to determine whether BATF approval for the transfer of his weapons by the Defendant to him had been secured; both Mr. Wittstein and John Saccone, his assistant, told the Plaintiff that BATF approval had not been received even though it had been, on March 10, 1987.
18. In March of 1988, the Plaintiff purchased a suppressed Ruger pistol and a suppressor (#S-1510) for one of his rifles purchased in December of 1986, hoping that by making this additional purchase he could expedite delivery of his December 1986 order; payment terms were negotiated by telephone with Valerie Wittstein who required a 50% deposit with the balance of 50% to be paid upon delivery. Sales tax was also to be paid upon delivery. (Plaintiff's Ex. 6). The order acknowledgment form for this order (Plaintiff's Ex. 6) and Form 4's to be filled out by Plaintiff were mailed to him by Defendant in April of 1988; and the Plaintiff returned the Form 4's for the pistol and suppressor in the March order, by mail, with his check on or about May 5, 1988. CT Page 8081
19. The March 1988 order acknowledgment form (Plaintiff's Ex. 6) also provided for delivery ASAP which both parties understood to mean "as soon as possible"; and "as soon as possible" was understood by both the Plaintiff and Defendant to mean as soon as the BATF paperwork was completed.
20. In May of 1988, the Plaintiff also purchased an MP5 gun from Ron's Gun Shop and received final BATF approval by July 20, 1988; in connection with this application, the Plaintiff received a BATF notice, acknowledging receipt of his Form 4, and since Plaintiff had received no similar BATF acknowledgment for the Form 4's pertaining to his Ruger pistol and suppressor (Plaintiff's Ex. 6) purchased from Defendant, Plaintiff began to suspect that the Defendant was being untruthful when Defendant's agent advised Plaintiff in July of 1988 that the Form 4 for his March 1988 order had not yet been approved. At that time, Plaintiff sought legal counsel and in the fall of 1988 commenced legal action against Defendant.
21. Plaintiff, at the commencement of this action (D.N. 508292) secured a $25,000.00 attachment against property of the Defendant, and shortly thereafter, Mr. Wittstein's home was substituted as collateral in lieu of the weapons of the Defendant originally attached. After such legal action was commenced, the parties through negotiations, attempted to resolve their differences to arrive at a firm date for the delivery of the weapons from the December 1986 and March 1988 orders to Plaintiff. When delivery was not accomplished by the spring of 1989, the Plaintiff then commenced a replevin action (D.N. 510438) and secured a prejudgment remedy order to replevin all those items purchased by Plaintiff in the December 1986 order (Plaintiff's Ex. 4).
22. Plaintiff was able to obtain possession of the three semi-automatic rifles converted to machine guns (the first three items in Plaintiff's Ex. 4) pursuant to a prejudgment order of replevin issued by this Court at the commencement of the second legal action; the sheriff delivered these rifles to Plaintiff on or about June 9, 1989 with transfer tax stamps and approved BATF forms. However, there was no approved BATF Form 4 or transfer tax stamps for the Project C suppressor (fourth item on Plaintiff's Ex. 4), so that the suppressor replevied by the sheriff is still in the hands of the sheriff.
23. The Plaintiff was required to commence this second legal action (D.N. 510438) in order to secure possession of the three machine guns (Plaintiff's Ex. 4) although BATF approval for the transfer of weapons from the Defendant to the Plaintiff had been secured approximately two years prior thereto, and the conversion work had been completed by the Defendant shortly prior to the CT Page 8082 commencement of the replevin action.
24. At about the time of the replevin, Wittstein indicated to the Plaintiff that the BATF must have lost the Form 4 for the Project C suppressor (fourth item on Plaintiff's Ex. 4), while at the time of trial Wittstein testified that the Defendant had never received this Form 4 back from the Plaintiff.
25. After June of 1989, Plaintiff received substitute Form 4's from the Defendant to be completed for the Project C suppressor (fourth item on Plaintiff's Ex. 4) and for the Ruger pistol and suppressor (Plaintiff's Ex. 6). Plaintiff processed these forms a second time and returned them to the Defendant very shortly thereafter (Plaintiff's Ex. 8, 9, 10) but since return of them to the Defendant in August of 1990, the Defendant has refused and failed to process these forms for BATF approval and thus the Plaintiff has not received the suppressors and pistol represented in Plaintiff's Exhibits 8, 9, 10. The Defendant is still in possession of the second set of Form 4's completed by the Plaintiff for the two suppressors and the Ruger pistol.
26. The suppressor purchased by the Plaintiff in December 1986 (Plaintiff's Ex. 4) was listed as having a serial number of #S-0708 on Plaintiff's order acknowledgment however, on the substitute Form 4 sent to Plaintiff in June of 1989 this suppressor was listed with a serial number of #S-0273 (Plaintiff's Ex. 9). And, the suppressor purchased by the Plaintiff in March of 1988 (Plaintiff's Ex. 6) was listed as having a serial number of #S-1510 on Plaintiff's order acknowledgment; however, on the substitute Form 4 sent to the Plaintiff in June 1989, this suppressor was listed with a serial number of #S-0562 (Plaintiff's Ex. 8).
27. Wittstein contends that when he discussed that the suppressor #S-0708 on Plaintiff's original order would not fit the Plaintiff's rifle, #S-0273 was substituted. Plaintiff disputes this and contends that #S-0708 was ultimately transferred to the owner of a rifle similar to Plaintiff's. Regardless of whether the Plaintiff or Defendant is factually correct, the Defendant never told the Plaintiff prior to May of 1990, when he forwarded a new Form 4 to the Plaintiff, that the wrong suppressor had been sold to him and that a suppressor with a different serial number would be substituted. Plaintiff went through the entire process a second time of completing the Form 4 for the substituted suppressor, #S-0273, which is the suppressor in the hands of the sheriff.
28. Wittstein contends that when he discovered that the suppressor #S-1510 would not fit the Plaintiff's MP5 rifle, but would only fit an Uzi, he substituted an #S-0562, which would fit Plaintiff's rifle. The Plaintiff contends and the Defendant concedes that a back cap, can adapt this suppressor for use on an CT Page 8083 MP5 rifle, with a minimal cost of $90.00 and three-quarters of an hour of work. The Defendant, prior to May of 1990, when it forwarded a new Form 4 to the Plaintiff, never told the Plaintiff that the wrong suppressor had been sold to him on the March 1988 order or that a suppressor with a different serial number would be substituted, nor did the Defendant give the Plaintiff the option of taking possession of what it could deliver at that time or of electing to convert the suppressor with a back cap.
29. Had the Plaintiff been advised by the Defendant of the mix up with the suppressors, Plaintiff might have taken possession of what the Defendant could have delivered, instead of spending numerous hours reprocessing Form 4's for the two suppressors; instead, the Defendant disposed of both #S-1510 and #S-0708 to third parties, without conferring with the Plaintiff, so that Plaintiff had to go through the inconvenience of being finger printed again and pursue the time consuming process of completing new Form 4's for the two substituted suppressors.
30. The parties stipulated that all evidence taken on the case bearing docket number 508292 will be admitted for whatever purposes necessary in the case bearing document number 510438.
31. In connection with the Plaintiff's March 1988 order, the Plaintiff paid $900 to the Defendant as a deposit thereon, which is what Defendant requested. Defendant, before trial, contended through its legal counsel that none of the $400 transfer tax was included in the $900 payment; but at trial, the Defendant contends that at best the $900 is made up of $575 for half of the merchandise purchased and only $375 towards the transfer tax. Sales tax was not to be paid until delivery. The $900 deposit paid by the Plaintiff to the Defendant was all that the agreement of the parties required at that stage, regardless of whether or not the full transfer tax had been paid, so that upon BATF approval and delivery, Plaintiff would owe $735.25 to the Defendant.
32. Wittstein contended at trial, that he had tried on behalf of the Defendant, to be as equitable and fair as possible in deciding whose weapons would be completed the earliest, after May of 1986, when he became swamped with work; he also contends that he tried to perform work in batches so that he had not started HK rifle conversions until well into 1987. However, Defendant never advised its customers that weapons would be converted in batches, or that the early delivery of a rifle to him did not necessarily assure that it would be worked on first. Defendant's selection of which weapons to convert first, process with BATF first and distribute back to owners was at best, arbitrary.
33. Several HK rifles delivered to the Defendant for conversion, and approved by BATF on the same date as the Plaintiff's CT Page 8084 approval, were transferred by Defendant to their owners, well over a year prior to the Plaintiff's securing his converted weapons back through the replevin action.
34. Many dealers who delivered their weapons to the Defendant for conversion, after the Plaintiff delivered his, received their converted weapons back from the Defendant before Plaintiff filed suit; however, the Defendant received his largest number of weapons for conversion from dealers, so no conclusion can be reached that Defendant's delivery practices favored dealers.
35. The Defendant could have completed conversion of the Plaintiff's HK rifles well before June of 1989, if in fact it had been performing conversions in batches as contended at trial, since numerous HK's were being converted in 1987 and 1988 by the Defendant.
36. Plaintiff did care what serial numbers were on the Project C suppressor (fourth item in December 1986 order) and the second suppressor (March 1988 order) because of the great deal of trouble and time involved on his part to resubmit Form 4's for these very specifically identified suppressors. The original and substitute suppressors may have been the same, in terms of form and function, but they became specifically identifiable as distinct units once assigned a serial number.
37. The Plaintiff has suffered a great deal of anxiety and stress because of his personal time and expense involved to secure his converted weapons through litigation, and because of the non-delivery and failure of the Defendant to complete the BATF processing of Form 4's for the suppressor purchased by him in December of 1986 and for the suppressor and pistol purchased by him in March 1988.
38. The Plaintiff's legal counsel billed him for $8,347.40 worth of legal services for work performed through November 26, 1990, at an hourly rate of $100 — $150 for attorneys, and $50 — $60 for paralegals. Although there was no expert testimony regarding the reasonableness of the legal fees charged, a review of the attorney's time slips (Plaintiff's Ex. 17) and the services therein described, indicates that the fees were reasonable for the services provided.
39. The Plaintiff in his brief contends that in excess of $28,783.42 of legal time and expenses have been incurred by the Plaintiff in connection with the two lawsuits brought by him. (D.N. 0508292 and 0510438). The Plaintiff has attached as Exhibit A to his memorandum of law an itemized bill for services provided from July 1986 — May of 1991, but there has only been testimony regarding the scope of services provided through November 26, 1990. The Court does note, however, from its own observations in the courtroom, that CT Page 8085 Plaintiff's counsel, James Parenteau, provided legal services in the trial of the two cases (and not included on Plaintiff's Ex. 17 ) as follows:
 11/27/90 6 hours 11/28/90 5 hours 11/29/90 8 hours 3/13/91 8 hours 3/14/91 7 hours
Total 34 hours
40. Attorney Parenteau's hourly rate in 1990 and 1991 was $150 per hour, which at 34 hours of trial time would be equivalent to a charge of $5100 for courtroom trial work.
41. The Plaintiff has incurred legal fees of at least $13,447.40 consisting of $8,347.40 for services in the two cases through November 26, 1990 plus $5100 for trial work thereafter.
II. CONCLUSIONS OF LAW
1. On April 16, 1986, the Plaintiff and Defendant entered in an express contract by which the Defendant agreed to convert three HK semi-automatic rifles owned by the Plaintiff into fully automatic submachine guns for the agreed upon price of $2,800.00, plus sales tax and federal transfer tax.
2. In accordance with the custom of the industry, Defendant's own practice and 29 C.F.R. § 179.84, Defendant prepared the BATF Form 4 applications to obtain federal tax stamps necessary to complete the transaction and allow Defendant to transfer the converted weapons to the Plaintiff.
3. In accordance with the contractual obligation assumed by the Defendant, Defendant forwarded Plaintiff's money and the completed application forms to the BATF for approval.
4. The parties further agreed that the Plaintiff would pay the entire sum due, and deliver to the Defendant the completed application forms, in advance of Defendant's obligation to forward the amount due for the transfer stamps and the application forms to the BATF, for the December 1986 order.
5. The parties further agreed that delivery of the converted semi-automatic weapons would be made when the Defendant had received authorization from the BATF to transfer the weapons as indicated by approved Form 4 applications.
6. On December 22, 1986, Plaintiff delivered the full amount CT Page 8086 due under the contract along with fully completed Form 4's and received Defendant's order acknowledgment form which reflected that Plaintiff had paid the full amount and stated a delivery term "ASAP" which meant "as soon as possible". Based upon Defendant's statement in April of 1986, this was understood by Plaintiff to mean as soon as BATF approval was received by Defendant.
7. Delivery of the converted semi-automatic weapons was required within a reasonable time of receipt of BATF approval and BATF approval was obtained on March 10, 1987.
8. As a proximate cause of Defendant's breach by failure to deliver within a reasonable time of March 10, 1987, Plaintiff was compelled to initiate two lawsuits; the first seeking damages and specific performance; the second to replevin Plaintiff's weapons.
9. On December 22, 1986, Plaintiff and Defendant entered into an express contract whereby Plaintiff agreed to purchase one AWCO Project C HK 33 Suppressor bearing serial number S-#0708 from Defendant for the sum of $300.00, plus sales tax and federal transfer tax.
10. In accordance with the prior conduct of the parties, the custom and practice of the industry and federal regulations, Defendant agreed to, and became obligated to, prepare and forward the application for transfer of federal tax stamps. The parties agreed that delivery of the Project C suppressor would be made upon receipt of BATF approval. Plaintiff paid the full purchase price, plus sales tax and the amount necessary to obtain federal transfer tax on the date of the parties entered into the agreement.
11. Defendant prepared the application Form 4 for the Project C suppressor and mailed it to Plaintiff who obtained the necessary signatures, fingerprint cards and photos. Plaintiff mailed the completed application forms to the Defendant on or about January 13, 1987. It is presumed that the Defendant received Plaintiff's application form.
12. Defendant breached the contract referred to in conclusion 9 hereof, by failing and refusing to forward Plaintiff's money and the completed the application forms to BATF for approval.
13. Defendant subsequently sold the Project C suppressor bearing serial number S-#0708 to a third party without notification to Plaintiff in breach of the implied covenant of good faith and fair dealing and the contract.
14. Subsequently, Defendant agreed to substitute the Project C suppressor with one bearing serial number S-#0273. Defendant forwarded the substitute application forms to Plaintiff. Plaintiff CT Page 8087 completed the form, and forwarded it to Defendant who received the form for the substitute Project C suppressor in August of 1990.
15. Defendant refuses to forward Plaintiff's money and the new Form 4 to the BATF for approval in order to obtain permission for delivery of the substitute Project C suppressor which was transferred to the possession of a deputy sheriff for the State of Connecticut in June of 1989.
16. On or about March 19, 1988, Plaintiff and Defendant entered into an agreement whereby Plaintiff agreed to purchase one AWC MK9 suppressor bearing serial number S-#1510 which was intended to be used with one of the remanufactured semi-automatic rifles involved in the 1986 transaction known as an MP5 sub-machine gun. At the same time, Plaintiff also purchased one suppressed Ruger pistol. The parties agreed that Plaintiff would pay 50% of the total purchase price as a down payment and pay the remainder upon tender of the goods together with sales tax.
17. In accordance with Defendant's obligation under said the agreement, Defendant prepared the Form 4's for BATF approval for the items purchased in the March 1988 order and mailed them to Plaintiff on April 21 and 26, 1988. In accordance with his obligation, Plaintiff completed the forms, obtained the signature of the police chief, the fingerprint cards and photographs, and forwarded all of the Form 4's to Defendant with his check in the amount of $900.00. Defendant received the check and the forms on or about May 7, 1988.
18. Defendant breached the contract referred to in conclusion 16 hereof, by failing to forward the BATF forms for the items in the March 1988 order to the BATF for approval and failing to obtain federal transfer tax stamps. As a proximate cause of Defendant's breach, Plaintiff was compelled to institute litigation in order to obtain an order requiring Defendant to comply with its obligation to process the BATF forms for the items in the March 1988 order.
19. Subsequent to the commencement of litigation it was discovered that the Defendant, without notice to Plaintiff, and without his agreement, transferred S-#1510 to a third party. Defendant's transfer of S-#1510 to a third party was a breach of the agreement.
20. Thereafter, Defendant forwarded a substitute Form 4 which described a substitute suppressor bearing number S-#0562. Plaintiff once again obtained the signature of the police chief, the fingerprint cards and photographs and forwarded the substitute Form 4 to Defendant who received it in August of 1990.
21. Defendant continues to refuse to forward the BATF Form 4 and Plaintiff's money to the BATF to obtain approval. CT Page 8088
22. Based upon the great inconvenience to Plaintiff, the specific identification of the suppressors to the contract, and the required filing of BATF Form 4's with proper transfer fees by the transferor, an order of specific performance under Connecticut General Statutes 42a-2-716 is appropriate to compel Defendant to forward the application forms and the monies for all transfer fees to the BATF for approval, to transfer to Plaintiff the Ruger pistol, the S-#0273 and S-#05652.
23. Defendant's refusal to forward the three Form 4's for the Ruger pistol, the S-#0273, and the S-#0562 and the necessary transfer tax fees constitutes a breach of the agreement of the parties and a breach of the implied covenant of good faith and fair dealing under common law and as stated in Connecticut General Statutes 42a-1-203 as defined by Connecticut General Statutes42a-1-201 (19).
24. Defendant is a person and is engaged in trade or commerce as defined by the Connecticut Unfair Trade Practices Act,42-110a(3) and (4) et. seq.
25. Defendant engaged in conduct which was both unfair and deceptive in violation of the Connecticut Unfair Trade Practices Act and Connecticut General States 42-110b(a).
26. Defendant deceived Plaintiff when he advised Plaintiff that delivery of Plaintiff's semi-automatic rifles remanufactured into sub-machine guns would occur at the time when BATF approval of Plaintiff's Form 4 and accompanying transfer taxes were obtained by Defendant, as opposed to advising Plaintiff that delivery would be made in the sole discretion of Defendant based upon when conversion of the weapons was completed.
27. Defendant deceived Plaintiff, commencing in April 1987 and continuing for every month thereafter through August 1988, when Defendant, through its agents, William Wittstein and John Saccone, advised Plaintiff that BATF approvals had not been obtained for the remanufactured semi-automatic weapons, when, in reality, Defendant had received approval from the BATF to transfer the remanufactured semi-automatic rifles to Plaintiff shortly after March 10, 1987.
28. Defendant deceived Plaintiff when in March of 1990 it stated it would prepare substitute Form 4's to obtain federal transfer tax stamps for the suppressed Ruger pistol and the substitute suppressors for S-#0708 and S-#1510, and forward those forms to Plaintiff for completion, without advising Plaintiff, Defendant would demand additional monies for the tax transfer fees above and beyond the $900.00 deposit already paid by Plaintiff before the Defendant would send anything to BATF. CT Page 8089
29. Defendant committed an unfair trade practice when it promised Plaintiff delivery of the remanufactured semi-automatic weapons upon receipt of the federal transfer tax stamps and approved Form 4's, but then failed to remanufacture Plaintiff's weapons to make delivery within a reasonable time of receipt of the transfer tax stamps on March 10, 1987, when Defendant was capable of making such delivery.
30. Defendant's method of communication with Plaintiff regarding the status of the work to convert Plaintiff's semi-automatic weapons, as well as the status of receipt and processing of BATF forms, is unfair because it created an atmosphere of uncertainty and anxiety in Plaintiff concerning Plaintiff's money and possessions and compelled Plaintiff to resort to litigation in order to obtain assurances that the remanufacture work be completed and his weapons ultimately redelivered to him.
31. Defendant's conduct was oppressive and does substantial injury to consumers because of its disregard for the legitimate expectations of consumers to be kept accurately informed about the status of goods held for repair or remanufacture.
32. Defendant's communication system concerning the processing of BATF forms is unfair because Defendant either negligently or willfully refuses to forward the BATF Form 4 applications for approval after indicating its agreement to do so.
33. Defendant's refusal to deliver the weapons and suppressors to Plaintiff within a reasonable time of receipt of BATF approval constitutes unreasonable delay which is an unfair and deceptive trade practice.
34. Defendant's conduct as enumerated in conclusions 26 through 33 above constitutes a violation of the implied covenant of good faith and fair dealing and the express obligation to deal fairly and in good faith as set forth in Connecticut General Statutes42a-1-203 and thus reveals a clear violation of public policy which is an unfair and deceptive trade practice.
35. As a result of the breach of the implied covenant of good faith and fair dealing and unfair and deceptive trade practices enumerated above, Plaintiff has sustained ascertainable losses and actual damages based upon inconvenience, delay of delivery and anxiety. Plaintiff is entitled to attorneys' fees for work reasonably performed in pursuing his CUTPA claim.
36. Defendant's unfair and deceptive trade practices compelled Plaintiff to engage in litigation solely to obtain Defendant's performance under the contract and as such entitles Plaintiff to CT Page 8090 attorney's fees under the Unfair Trade Practices Act.
37. Defendant's refusal to file the three Form 4's in its possession for the two suppressors and the the Ruger pistol demonstrates a reckless indifference to Plaintiff's rights to have these processed with the BATF and entitles the Plaintiff to punitive damages.
III. MEMORANDUM OF DECISION
The Plaintiff, in his Fourth Amended Complaint dated December 18, 1990 has stated two causes of action: the first alleges violations of the Connecticut Unfair Trade Practices Act, C.G.S.42-110a, et seq. (First Count) and the second alleges the breach of an implied covenant of good faith and fair dealing which was part of the contract between the Plaintiff and Defendant, in connection with purchase and delivery of rifles, suppressors and a pistol (Second Count).
The Defendant, by pleading dated March 11, 1991, seeks to set off against any damages alleged by Plaintiff, the increase in value of the fully automatic weapons finally delivered to the Plaintiff. Further, the Defendant specially defended, that since it has not received approved BATF transfer forms, it is legally impossible for it to complete the contract between the parties with respect to the two suppressors and pistol (First Special Defense); and that as to the items not yet delivered to Plaintiff, the Plaintiff has failed to pay the balance due for such items. A third special defense filed by the Defendant was stricken from the pleadings on March 13, 1991, Hurley J., without prejudice to the Defendant to raise the issue of subject matter jurisdiction at a later time.
The Plaintiff has sustained his burden of proof on both counts of his Fourth Amended Complaint and is entitled to judgment on both counts of his Complaint, together with the relief as hereinafter set forth.
Taking the Second Count first, the Plaintiff has alleged and proven that there was an express agreement, whereby the Defendant was to convert the Plaintiff's three semi-automatic weapons into fully automatic weapons and provide a Project C suppressor to Plaintiff as soon as possible after the BATF had approved the transfers. (Plaintiff's Ex. 4). In addition, there was a second express agreement whereby the Defendant sold to the Plaintiff and agreed to transfer to Plaintiff, after BATF approval, a Ruger pistol and a suppressor for Plaintiff's MP5, (Plaintiff's Ex. 6). Where a contract contains no set or specific time for delivery, the law requires that delivery be made in a reasonable time, C.G.S.42a-2-309 (2) and what is a reasonable time is usually a question of fact under all the circumstances. Bradford Novelty Co. v. CT Page 8091 Technomatic, Inc., 142 Conn. 166, 171 (1955). Failure to perform within a reasonable time of the delivery date constitutes a breach of contract. Janulewycz v. Quagliano, 88 Conn. 64 (1914). Where items are specially manufactured, time may not be of the essence of a contract because of the likelihood of a delay, however, unless factors causing the delay are beyond the Defendant's control, he is still required to perform within a reasonable time of the stipulated date. Bradford, supra.
The course of dealing between the Defendant and Plaintiff established that if the Plaintiff completed the BATF Form 4's and submitted them to Defendant, Defendant would then process them with the BATF. Defendant did this for the three HK's on the December 1986 order and the Plaintiff had reasonable grounds to believe that the Defendant would proceed in the same fashion with respect to his March 1988 order. In fact, the Defendant testified that the transferor customarily did this for the transferee; further, 29 C.F.R. § 179.84 requires the transferor to handle the submission of Form 4's to the BATF. A course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expression, and conduct" C.G.S.42a-1-205(1). A "usage of trade", is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. C.G.S. 42a-1-205 (2). Defendant conceded that the usage of trade was for the transferor to send Form 4's to the BATF and Plaintiff could reasonably have expected that Defendant would proceed to do so in a timely fashion. Defendant's agreement to perform work for the conversion of Plaintiff's weapons, to register them with the BATF and to redeliver them to Plaintiff as soon as possible, carried with it a implied covenant of good faith and fair dealing. Such covenant exists in every contract without limitation. 2 Restatement of Contracts, 2d 205 (1979); C.G.S. 42a-1-203. Essentially, it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 567 (1984). The phrase, good faith, excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness. Id at 566.
In the case at bar, the Defendant breached this implied covenant of good faith and fair dealing in connection with the contract between the parties for the sale, remanufacture and delivery of the weapons and suppressors because: (1) The Defendant never informed the Plaintiff that he was overloaded with conversions due to the proposed change in the law to take effect on May 19, 1986 but only told Plaintiff that delays in redelivery to Plaintiff would be due to the slow BATF processing of Form 4's; (2) Defendant never CT Page 8092 informed the Plaintiff that the bulk of the conversion work to be done by Defendant on the semi-automatic weapons, would have to been done after BATF approval, because of the substantial number of weapons Defendant had to work on; (3) Defendant never told the Plaintiff about the mix up in suppressors on both the December 1986 and the March 1988 orders, or that he had unilaterally substituted other suppressors without giving the Plaintiff the option of deciding how to proceed after the mix up; (4) Defendant and his agents told Plaintiff, for over a year after BATF approval of the transfer of the three rifles, that no BATF approvals had been secured for those three items on the December 1986 order; (5) Defendant refused even after a second set of Form 4's had been furnished by Plaintiff for the Project C suppressor, the pistol and the suppressor for the MP5, to process these forms with the BATF, notwithstanding the fact that Plaintiff had fully paid for the December 1986 order and had paid the agreed upon deposit for the March 1988 order.
Specific performance of the contract in this case is appropriate. The substituted suppressor from the December 1986 (#S-#0273) order, has already been specifically identified to the contract because a serial number has been affixed to it and Plaintiff has already completed the Form 4 for it (Plaintiff Ex. 9). In addition, both items from the March 1988 order have been specifically identified to the contract; the substituted suppressor from the March 1988 contract has been identified to the contract because a serial number has been assigned to it and Plaintiff has completed the Form 4 for it (#S-#0562; Plaintiff's Ex. 8). Plaintiff has also completed the Form 4 for the Ruger pistol and delivered it to the Defendant. The Plaintiff has fully paid for the December 1986 order and has paid the agreed upon deposit on the March 1988 order and there fore specific performance is proper to prevent considerable delay and inconvenience to the Plaintiff.
The Plaintiff has alleged and proven violations of the Connecticut Unfair Trade Practices Act, C.G.S. 42-110a, et seq. (hereinafter CUTPA); this act provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce". C.G.S.42-110b(a). The instant transaction for the sale, manufacture and delivery of remanufactured weapons to Plaintiff meets the statutory definition of trade or commerce, C.G.S. 42-110a(4) and the Defendant-corporation is a defined person under the statute C.G.S.42-110a(3). The criteria to be employed to determine whether a practice violates CUTPA include:
 "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of CT Page 8093 some common law, statutory, or other established concept of unfairness (2) Whether it is immoral, unethical, oppressive, or unscrupulous; (3) Whether it causes substantial injury to consumers [competitors or other businessman]."' Thus, a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Web Press Services Corporation v. New London Motors, Inc., 203 Conn. 342, 355 (1987).
These three criteria are used to determine whether a particular practice is unfair, and are the criteria set out in the "cigarette rule" by the Federal Trade Commission. FTC v. Sperry Hutchinson,405 U.S. 233, 244-245, 92 S.Ct. 989, 31 L.Ed.2d 170 (1972). All three criteria need not necessarily be satisfied to support a finding of unfairness. Atlantic Richfield Co. v. Canaan Oil Co.,202 Conn. 234, 242 (1987); a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. McLaughlin Ford, Inc. v. Ford Motor Co.,192 Conn. 558, 569, n. 15 (1984).
The test for deception has three requirements: (1) A representation, omission or other practice likely to mislead consumers; (2) The consumer must interpret the message reasonably under the circumstances; (3) The misleading representation, omission or practice must be material, that is, likely to affect the consumer's decision or conduct. Caldor, Inc. v. Heslin, 215 Conn. 590,597 (1990).
The Defendant's failure to deal in good faith in connection with its contractual relations with the Plaintiff was oppressive, and satisfies the second tier of the unfairness test. In addition, the Defendant's failure to deliver the goods to Plaintiff within a reasonable time after BATF approval, the Defendant's consistent indication that no BATF approval had been secured for a year after it had been and Defendant's holding of Plaintiff's money without performing the contracted for services within a reasonable time, are all the very type of conduct which injures consumers.
Defendant omitted to tell Plaintiff numerous material facts, and therefore deceived Plaintiff. Defendant failed to disclose that delivery of the weapons and suppressors was not going to occur immediately upon receipt of BATF approval; Defendant failed to disclose that it was overwhelmed with conversion work which would substantially delay delivery to Plaintiff Defendant failed to disclose the mix up of the suppressors and unilaterally substituted other suppressors thereby necessitating substantial work and time on Plaintiff's part to secure new Form 4's; Defendant failed to process the second set of Form 4's so that Plaintiff was forced to institute litigation to secure delivery of some of the items fully paid for. CT Page 8094
The Plaintiff has suffered an "ascertainable loss" as required by C.G.S. 42-110g(a). Whenever a consumer has received something other than what he has bargained for, he has suffered a loss of money and property. Hinchliffe v. American Motors Corporation,184 Conn. 607, 614 (1981). In this case Plaintiff could not secure any of its weapons at all, without the use of legal process. Although a Plaintiff may not show any specific dollar amount actual damages, "ascertainable loss" includes mental or emotional distress, Haesche v. Kissner, 4 CSCR 718 (1989). The Plaintiff in the case at bar, suffered anxiety and stress because of Defendant's non-delivery of his weapons, even after the second set of Form 4's were delivered to Defendant. Where no actual damages are shown, a Court in its discretion may still award punitive damages and attorneys fees under CUTPA. 42-110g(a) and (d); Tillquist v. Ford Motor Credit Co.,714 F. Sup. 607 (D.Conn. 1989).
An individual may maintain a private cause of action for a CUTPA violation which singularly impacts on him, without the necessity of the claim being based on a general course of conduct. Al Tech Specialty Steel v. United States, 651 F. Sup. 1421 (D.Conn. 1987); the public interest requirement of a private action under CUTPA was eliminated by a 1984 amendment to the statute. Lembo v. Schlesinger,15 Conn. App. 150, 155 (1988).
Where a CUTPA violation is found a court should award attorneys fees, Barco Auto Leasing Corporation v. House, 202 Conn. 106, 120
(1984). While no expert testimony was provided, Plaintiff's counsel has provided the Court with an adequate description of the type and scope of legal services provided. An award of both attorney's fees and punitive damages under CUTPA may be made. Ford v. Blue Cross and Blue Shield of Connecticut, Inc., 216 Conn. 40 (1990).
1. Judgment shall enter for the Plaintiff on the First Count and relief shall be awarded as follows:
 a. The sum of $10,000.00 shall be awarded to the Plaintiff as counsel fees to be paid to Plaintiff by the Defendant;
 b. The sum of $1,000.00 shall be paid by the Defendant to the Plaintiff as punitive damages for the failure of Defendant to file with the BATF the Form 4's currently in its possession and provided by Plaintiff to Defendant, for the Project C suppressor, the Ruger pistol and the suppressor for the MP5.
 c. Equitable relief is further granted to the Plaintiff in the form of an affirmative injunction restraining the Defendant from transferring #S-0273, #S-0562 and the suppressed Ruger pistol, serial no. 109, purchased in the March 1988 order, to any person or entity other than Plaintiff, pending receipt of BATF approval of the transfer and tax stamps to Plaintiff.
CT Page 8095
2. Judgment shall enter for the Plaintiff on the Second Count and the Defendant shall perform its obligations under the contracts between the parties by:
 a. Filing with the BATF forthwith, the Form 4's completed by the Plaintiff and in Defendant's possession for the Ruger pistol, and two suppressors (#S-#0273 and #S-#0562) which are to be filed together with Defendant's check for all transfer tax stamps and transfer fees
 b. Notifying Plaintiff and Plaintiff's counsel, in writing, by registered or certified mail return receipt, immediately upon Defendant's receipt of BATF approval and tax stamps for the transfer to Plaintiff. Plaintiff shall then be entitled to delivery of the #S-#0273 immediately after approval. Further, Plaintiff shall be entitled after such approval by BATF to delivery of the suppressed Ruger pistol serial no. 109 and S-#0562 immediately upon payment to the Defendant of the sum of $736.25, all such delivery and payment to be made at Defendant's place of business. Together with the delivery of the foregoing weapons, Defendant shall deliver all approved BATF transfer forms and tax stamps to Plaintiff.
c. The Defendant's claim of set-off is denied.
 d. The Defendant has not sustained its burden of proof on its First and Second Special Defenses.
ATTORNEY TRIAL REFEREE JANE W. FREEMAN CT Page 8096
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 8097
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 8098
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 8099
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 8100
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 8102